UNITED STATES of America, Appellee,

v.

**Braj Nandan SINGH,
Defendant-Appellant.**

**No. 1248, Docket 86–1075.**

United States Court of Appeals,
Second Circuit.

Argued May 8, 1986.
Decided Feb. 9, 1987.

---

Gregory J. O'Connell, Asst. U.S. Atty., Brooklyn, N.Y. (Reena Raggi, U.S. Atty., E.D.N.Y., Allyne R. Ross, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Herald Price Fahringer, New York City (Diarmuid White, New York City, of counsel), for defendant-appellant.

Before VAN GRAAFEILAND,
KEARSE and MINER, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Braj Nandan Singh appeals from a judgment of the United States District Court for the Eastern District of New York convicting him after a jury trial before Judge Sifton of importing, possessing and conspiring to distribute substantial quantities of heroin and hashish. Appellant contends that the district court committed reversible error in denying his motion to suppress evidence concerning seized narcotics and also made several erroneous procedural and evidentiary rulings. Finding no merit in these contentions, we affirm.

This litigation centers on a twenty-foot shipping container consigned to appellant's company, Little India of Queens, which arrived aboard ship at Port Newark, New

Jersey in May 1985. The Customs Inspector who checked the contents of the container found that they consisted of burlap bags and crates wrapped in burlap. Although the shipping documents indicated that the container held 258 packages of foodstuffs, inspection of a bag selected at random disclosed that it was filled with hashish.

Because the customs officials were not then in a position to arrest anyone as the possessor or owner of the illegal shipment, see *United States v. Issod*, 508 F.2d 990, 993 (7th Cir.1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1975), they decided to attempt a "controlled delivery" of the shipment to the named consignee or whoever purported to act as such. The purpose and mechanics of a controlled delivery are described in *Illinois v. Andreas*, 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983), as follows:

> The lawful discovery by common carriers or customs officers of contraband in transit presents law enforcement authorities with an opportunity to identify and prosecute the person or persons responsible for the movement of the contraband. To accomplish this, the police, rather than simply seizing the contraband and destroying it, make a so-called controlled delivery of the container to its consignee, allowing the container to continue its journey to the destination contemplated by the parties. The person dealing in the contraband can then be identified upon taking possession of and asserting dominion over the container.

*Id.* at 769, 103 S.Ct. at 3323 (footnotes omitted).

In keeping with the concept of what is in effect a quasi or restricted delivery, the customs officials turned over the container to the trucking company hired by appellant, and then, with the assistance of Drug Enforcement Administration (DEA) agents, kept the container under close surveillance until it arrived in front of a small storeroom maintained by appellant in a building in Queens, New York. Appellant and four workmen under his supervision then began to unload the packages from the container, placing some of them in a van owned by appellant and some in the storeroom. Although the street-level storeroom occupied only about 600 square feet, the entrance into it from the street was sufficiently wide that ten people could stand shoulder to shoulder inside it. The doors of the entranceway remained wide open during the unloading process. The unloaded packages were placed just inside the open doors and remained visible to the customs and DEA agents at all times. After approximately 85 percent of the cargo had been unloaded, the agents moved in and arrested appellant.

Appellant's arrest halted the unloading. As of that time, thirty-nine packages of hashish and one package of heroin remained in the container, and one package of hashish was inside appellant's van. In checking several of the packages, the agents discovered that the ones which contained the narcotics had metal bands around them. The agents proceeded to examine the banded crates that were "right at the doorway", "right in the door", "intermingled right at the doorway", "right in the doorway" of the storeroom, and found seventy-five of them to contain hashish. All of the contraband packages were replaced in the container so that they could be removed the following day. In all, about 125 of the 258 consigned packages were searched, and 115 of these contained narcotics. Appellant now contends that the district court committed prejudicial error in admitting testimony concerning the seventy-five packages of contraband that were searched after they had reached the sanctuary of the warehouse doorway and that he therefore was entitled to a new trial. We disagree.

In *United States v. DeBerry*, 487 F.2d 448 (2d Cir.1973), a leading Second Circuit case dealing with controlled deliveries, law enforcement officers were called to an air terminal in Los Angeles because a freight agent there had discovered that a suitcase en route to New York contained marijuana. After verifying the presence of the drugs, the officers closed the suitcase and sent it

on its way to New York. Officers in New York, who carefully surveilled the unloading and storage of the satchel, also watched as one of the defendants claimed it and placed it in his car. Relying on *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), the defendants argued that the subsequent, warrantless seizure of the drugs from the car was unlawful. Rejecting this contention, we pointed out that the drugs were lawfully seized in California, and continued:

> Even though the suitcase was then in transit, later in the luggage bin, and later still in the freight room, it remained legally "seized" just as much as if it were under the actual physical control of the police. In fact, except for the time that it was actually in the airplane's belly, it was under the close surveillance of the police. Thus, when the agents and police in New York removed the bag from the back seat of the car appellants were in, they were not making an initial seizure, but rather were merely reasserting control of the suitcase which had already been seized ˙for legal purposes and which was merely being used as bait. Accordingly, no warrant was required.

*Id.* at 451 (footnotes omitted).

■ *DeBerry* teaches that in a typical "controlled delivery" case, the validity of the seizure is determined as of the time the drugs are first seized, not as of the time they are retaken. Having taken proper dominion over the drugs and kept them under close surveillance, the government is deemed to be in constructive possession of them, even though, for purpose of identification, they are delivered to another. Other Circuits are in accord. *See, e.g., United States v. Bulgier*, 618 F.2d 472, 478 (7th Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 51 (1980); *United States v. Andrews*, 618 F.2d 646, 654 (10th Cir.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 84, 66 L.Ed.2d 26 (1980); *United States v. Ford*, 525 F.2d 1308, 1312–13 (10th Cir.1975); *United States v. Issod, supra*, 508 F.2d at 993; *see also United States v. Emery*, 541 F.2d 887, 890 (1st Cir.1976). This means, says the Supreme Court, that "[n]o protect-

ed privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal." *Illinois v. Andreas, supra*, 463 U.S. at 771, 103 S.Ct. at 3324.

Of course, in order for a controlled delivery to accomplish its intended purpose, there must be an actual delivery to a defendant and sufficient exercise of dominion by him to demonstrate his participation in the unlawful importation of the narcotics in question. It would be strange indeed if the very acts upon which the government relied to establish the defendant's dominion over the contraband in the instant case would deprive the government of its constructive possession of the contraband. This does not mean that the government should have the general right to make a warrantless search of a private warehouse or dwelling for the purpose of terminating a controlled delivery. We are not confronted here with an unlimited search of appellant's storeroom, but with the retaking of contraband located just inside the open storeroom doors, under direct government surveillance and constructively in the government's possession. *See United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); *United States v. Mason*, 661 F.2d 45, 46–47 (5th Cir.1981). In view of the minimal nature of the government agents' intrusion and the need for continued surveillance, or an effective substitute therefor, if the controlled delivery of the narcotics was to be effective, *see Illinois v. Andreas, supra*, 463 U.S. at 773, 103 S.Ct. at 3325, *id.* at 781–82, 103 S.Ct. at 3329–30 (Brennan, J., dissenting), a reasonable argument might have been made that, under the peculiar facts of this case, there was an " 'urgent need' that 'justif[ied]' a warrantless entry." *United States v. Martinez-Gonzalez*, 686 F.2d 93, 100 (2d Cir. 1982); *see United States v. Martino*, 664 F.2d 860, 869–70 (2d Cir.1981), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982).

■ However, because this troublesome argument was not made below, we do not

consider it. We look instead to the Government's contention that its retaking of the warehoused narcotics yielded nothing of evidentiary value that was not already in its possession. When the government agents began their inspection of the suspected packages, they quickly discovered that the ones which contained narcotics had metal bands around them. Without entering appellant's storeroom at all, the agents could have made a reasonably accurate approximation of how many banded crates had been removed to the storeroom. Moreover, many of the banded packages that were "right in the doorway" were readily observable from outside the storeroom. Both the agents and the jury, which had photographs of the warehoused narcotics, reasonably could conclude that these banded packages contained narcotics.

■ Finally, assuming for the argument that evidence of the contents of the packages in the warehouse should not have been admitted, we are convinced beyond a reasonable doubt that its admission was harmless error. As already pointed out, forty of the packages containing hashish, with a wholesale value of over $4 million, and a package of heroin, with a street value of $10–12 million, had not been removed to appellant's storeroom when they were retaken by the government agents. Under the controlled delivery rule, this retaking cannot be challenged. A reasonable jury undoubtedly would correctly conclude that the contents of the packages removed to the storeroom would be as incriminating as the contents of those that were outside the building. It is simply inconceivable that the jury in this case, or any other jury in similar circumstances, would have acquitted. *See Rose v. Clark,* — U.S. ——, 106 S.Ct. 3101, 3105, 92 L.Ed.2d 460 (1986); *United States v. Young,* 745 F.2d 733, 759–60 (2d Cir.1984), *cert. denied,* 470 U.S. 1984, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985).

Appellant's remaining arguments can be quickly disposed of. Appellant sought to establish through the cross-examination of a Government witness that appellant's lawyer had told the witness appellant had been offered the free services of another lawyer sent to appellant by an unidentified person, and that appellant's lawyer also had given the Government witness information about appellant's assertedly innocuous prior business dealings with the consignors of the seized narcotics. Recognizing that the proposed testimony was hearsay, the district judge refused to accept it, but stated that he would be willing to reconsider his ruling after appellant testified, when the court would be "in a better position to see what first-hand information there is." When appellant then offered the testimony of the legal samaritan, the district judge stated that, in the existing posture of the case, he was unable to determine whether the probative value of permitting a lawyer to come in and testify that he had been sent by some unidentified person outweighed the possible prejudice and confusion that might result. Again, the court expressed its willingness to reconsider after some groundwork for the testimony had been laid.

■ Relying on *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972), appellant contends that the above rulings denied him due process by requiring him to be the first defense witness and deprived him of his right against self-incrimination. This reliance is misplaced. In *Brooks,* the Court invalidated a Tennessee statute which provided categorically that a defendant desiring to testify "shall do so before any other testimony for the defense is heard by the court trying the case." The district court applied no such rule in the instant case. Indeed the court did not compel appellant to testify at all. It merely refused to accept the proffered testimony of other witnesses until a proper foundation was laid. There was nothing erroneous about this. *See United States v. Truesdale,* 400 F.2d 620, 623–24 (2d Cir. 1968). The rule properly applicable to the situation in the instant case is set forth in *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976):

Our cases have consistently recognized the important role the trial judge plays in the federal system of criminal justice.

"[T]he judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." *Quercia v. United States,* 289 U.S. 466, 469 [53 S.Ct. 698, 698, 77 L.Ed. 1321] (1933). A criminal trial does not unfold like a play with actors following a script; there is no scenario and can be none. The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process. To this end, he may determine generally the order in which parties will adduce proof; his determination will be reviewed only for abuse of discretion. *Id.* at 86, 96 S.Ct. at 1334. *See also* Fed.R. Evid. 611(a).

█ Finally, we see no error in the admission of testimony by a Government rebuttal witness that he had dealt with appellant in a series of drug transactions during the year preceding appellant's arrest. Such evidence was admissible to prove appellant's knowledge and intent in the transaction which led to his conviction. *United States v. Santiago,* 528 F.2d 1130, 1134 (2d Cir.), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976); *United States v. Brettholz,* 485 F.2d 483, 487 (2d Cir. 1973), *cert. denied,* 415 U.S. 976, 94 S.Ct. 1561, 39 L.Ed.2d 871 (1974). Moreover, it was for the jury, not this Court, to determine the credibility of the witness who provided the challenged evidence. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 80 L.Ed. 680 (1942).

The judgment of conviction is affirmed.

KEARSE, Circuit Judge, dissenting:

With all due respect, I dissent from the majority's ruling that the district court did not err in refusing to suppress the evidence seized from the warehouse of defendant Braj Nandan Singh. The majority apparently concludes that the entry into the warehouse, the search of crates therein, and the seizure of those crates, all without a warrant, did not violate Singh's rights under the Fourth Amendment to the Constitution. This *ratio decidendi* is not that used by the district court to deny the suppression motion; the district court found the entry, search, and seizure unlawful but found that suppression should be denied on the basis of two exceptions to the exclusionary rule. Nor is the majority's rationale the rationale advanced by the government in support of the district court's decision; the government does not argue that the entry, search, and seizure were lawful but rather argues that suppression was properly denied because of exceptions to the exclusionary rule, albeit not the same pair of exceptions invoked by the district court. I disagree with all three rationales and, for the reasons below, believe that the entry and search of Singh's warehouse violated Singh's Fourth Amendment rights, that the warrantless seizure of evidence from the warehouse was unlawful, and that no exception to the exclusionary rule justified the district court's refusal to suppress the unlawfully seized evidence.

A. *Neither the Facts Nor Fourth Amendment Principles Warrant the Majority's Conclusion that the Entry, Search, and Seizure Were Lawful*

The key factual premise of the majority's view that the agents did not violate Singh's privacy interest in the storehouse to any significant degree is that they merely searched "the banded crates that were 'right at the doorway', 'right in the door', 'intermingled right at the doorway', 'right in the doorway' of the storeroom." Majority opinion *ante* at 760. The majority felt it was "not confronted here with an unlimited search of appellant's storeroom, but with the retaking of contraband located just inside the open storeroom doors ...," *id.* at 761, and with a search that was a "minimal ... intrusion," *id.* at 761. An affirmance on this basis is supported neither by the factual findings of the district court nor by Fourth Amendment doctrine.

The picture painted by the majority is at odds with that drawn by the district court in its findings of fact. In part this is

doubtless because all of the "doorway" phrases quoted by the majority come from the agents' testimony at trial, after the district court had found the agents' entry unlawful, not from anything that was presented to the court on the pretrial motion to suppress. In any event, the findings and record below indicate that a relatively thorough warrantless search was indeed made. Far from finding that the crates searched by the agents were right in or at the doorway to the storehouse, the court found that "[t]he warehouse appeared filled with crates and sacks of which a 'majority' were from the container." Memorandum and Order dated October 1, 1985 ("October 1 Order"), at 7. This finding was virtually compelled by the record on the suppression motion. Immediately after their entry and search of the warehouse, the agents sought a warrant to search that building further and to search Singh's home and his store. In support of this warrant application, Drug Enforcement Administration ("DEA") Special Agent Thomas J. Sharkey submitted an affidavit ("Sharkey Aff.") in which he stated, *inter alia*, that "the storehouse ... was literally filled with burlap-wrapped wooden crates and burlap sacks, the majority of which appeared to have come from the container." (Sharkey Aff. ¶ 16.) Thus, the majority's finding that the crates searched were just at the doorway of the warehouse is contradicted by the district court's finding and the virtually contemporary sworn statement of Sharkey.

Further, the majority finds that not all of the crates unloaded from the container were searched before a warrant was obtained. Though there is some support for that proposition in the Sharkey affidavit, the district court noted that there was confusion in the record, and it resolved the issue in favor of finding that "[a]ll of the crates identified as coming from the container were opened without a search warrant." October 1 Order at 7. This finding was supported not only by a statement in the Sharkey affidavit that appeared to describe the contents of all the crates, but also by the government's memorandum in opposition to Singh's motion to suppress, which stated that the agents had, prior to obtaining a warrant, seized "the packages that had been carried into the storehouse," (Government's Memorandum of Law in Opposition to Motion To Suppress, July 31, 1985, at 5). The district court's findings of fact on a suppression motion are to be upheld unless they are clearly erroneous. *See, e.g., United States v. Ramirez-Cifuentes*, 682 F.2d 337, 344 (2d Cir.1982); *United States v. Chiarizio*, 525 F.2d 289, 292–93 (2d Cir.1975). The court's finding that all of the crates from the container had been searched without a warrant was not clearly erroneous and should not have been disregarded.

Finally, far from making a "minimal ... intrusion," Majority opinion *ante* at 761, by merely reaching into the doorway of the warehouse to search the 209 crates that had just been unloaded from the container into the warehouse, the agents must have conducted a reasonably thorough search of the warehouse, for the Sharkey affidavit argued that the results of that search furnished probable cause for the issuance of a warrant to search Singh's home and store. Thus, after noting that in his experience importers of large shipments of controlled substances maintained documents and large amounts of money relating to their operations, Sharkey stated that "[n]o documents or monies were found inside the storehouse by U.S. Customs agents who had examined the crates inside the storehouse." (Sharkey Aff. ¶ 20.) Sharkey stated that it was probable that documents, money, etc., were either at Singh's store or his residence "[b]ecause there were no documents inside Singh's storehouse." (*Id.*) No good faith representation to this effect could have been made with respect to a warehouse "literally filled" with crates and sacks, (Sharkey Aff. ¶ 16), without a relatively thorough search.

Even were the majority correct in its view that there was no thorough search but only a minimal intrusion into Singh's premises, however, I know of no Fourth Amendment principle that accepts this as a

basis for finding that the entry did not violate Singh's Fourth Amendment rights. *Cf. Katz v. United States,* 389 U.S. 347, 356–57, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (in the absence of judicial authorization, the "Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end."). For business premises as well as residences, *see, e.g., G.M. Leasing Corp. v. United States,* 429 U.S. 338, 353, 97 S.Ct. 619, 629, 50 L.Ed.2d 530 (1977); *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980).

Nor do I see support in Fourth Amendment doctrine for the majority's ruling that the agents were entitled to enter the storehouse either because they had made a seizure of the container at the border or on the theory that they had "constructive possession" of the crates in the container thereafter. Preliminarily, I must note that the majority appears not to differentiate between distinct parts of the individual's privacy expectation. The expectation includes at least the notion that an intruder will not enter his premises. It may also include the notion that an outsider will not see the activities or contents of his premises. The latter expectation is easily lost if the individual exposes interior premises to ordinary view, and this loss may allow the agents to use what they have seen to show a magistrate that there is probable cause for a warrant to enter and search, *see, e.g., United States v. Taborda,* 635 F.2d 131, 139 (2d Cir.1980); but merely making the interior of a building visible to an outsider does not constitute an invitation to enter. Here, the district court found that Singh had kept his warehouse locked—a fact mentioned by the Sharkey affidavit—and that Singh had a reasonable expectation of privacy in that building. The court found that that expectation was not lost by Singh's opening the doors of the warehouse to permit transport of the crates from the container into the warehouse; though the open doors permitted surveillance, they did not invite "physical invasion such as the agents' entry involved." October 1 Order at 11. The government has not challenged these findings and I have found no basis in the record for disturbing them.

Given the various aspects of an individual's expectation of privacy, the facts that agents had searched one crate and that thereafter some or all of the crates remained visible did not ensure the agents' retention of possession of the crates. Obviously the agents did not have actual possession since they had allowed the trucker to take physical possession. Nor, since Singh had a legitimate expectation that no uninvited person would enter his warehouse, did the agents have constructive possession once the crates were moved inside the warehouse. The majority's conclusion that the agents had the right to enter the warehouse to seize the crates because they had constructive possession of the crates puts the analytical cart before the horse. The traditional concept is that a person has constructive possession of property if he has the power to exercise dominion and control over it. *See, e.g., United States v. Damsky,* 740 F.2d 134, 139 (2d Cir.) (defendant had constructive possession of narcotics in vehicle over which he had dominion and control), *cert. denied,* 469 U.S. 918, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984); *United States v. Schocket,* 753 F.2d 336, 340 (4th Cir.1985) (defendant had constructive possession of narcotics in his own room though he was absent). Since the warehouse was an area in which Singh had, and had not lost, his expectation of privacy, the agents had no right to enter it; they thus lacked dominion and control over items inside the warehouse and hence lacked constructive possession of them. The mere visibility of the crates did not give the agents either dominion and control

over them or the right to enter the premises.

The irony found by the majority in the possibility that "the very acts upon which the government relied to establish the defendant's dominion over the contraband . . . [c]ould deprive the government of its constructive possession of the contraband," Majority opinion *ante* at 761, is irony miscast. The controlled delivery device is used to *"identif[y]"* the "person . . . taking possession of and asserting dominion over" the package. *Illinois v. Andreas*, 463 U.S. 765, 769, 103 S.Ct. 3319, 3323, 77 L.Ed.2d 1003 (1983) (emphasis added). Thus, the majority's interpretation of *Andreas* as authorizing the agents' entry into Singh's warehouse seeks to extend the holding in that case far beyond its facts. There the agents had made a controlled delivery of a container, previously opened at the border and found to contain narcotics, to Andreas, who took the container into his apartment. One agent then went to get a search warrant while the other kept the apartment under surveillance. Before the warrant could be obtained, Andreas left his apartment with the container, whereupon he was arrested and the container was seized. It was thereafter opened without the warrant having issued. The Supreme Court ruled that the opening of the container, previously opened in the border search, did not violate Andreas's Fourth Amendment right of privacy *in the container; the Court did not suggest that it would have been permissible for the agents to go into Andreas's apartment to seize the container.* *Accord United States v. Saint Prix*, 672 F.2d 1077, 1082 n. 10 (2d Cir.) (" 'border search' exception does not justify searches of homes or business establishments"), *cert. denied*, 456 U.S. 992, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982).

Finally, I find the majority's reliance on *United States v. DeBerry*, 487 F.2d 448 (2d Cir.1973), unpersuasive since the agents there seized the suitcase, previously subjected to a border search, from a car. Fourth Amendment doctrine has long recognized that a person has a stronger privacy expectation in a private building than in a vehicle:

> "[T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of Government, as recognizing a *necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile,* for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."

*California v. Carney*, 471 U.S. 386, 390, 105 S.Ct. 2066, 2068, 85 L.Ed.2d 406 (1985) (quoting *Carroll v. United States*, 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 545 (1925)) (emphasis mine). The other authorities cited by the majority are no more apposite. For example, *United States v. Bulgier*, 618 F.2d 472, 478 (7th Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 51 (1980), involved agents reopening a piece of luggage while it was still at the airport; *United States v. Andrews*, 618 F.2d 646, 654 (10th Cir.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 84, 60 L.Ed.2d 26 (1980); *United States v. Ford*, 525 F.2d 1308, 1312–13 (10th Cir.1975); and *United States v. Issod*, 508 F.2d 990, 993 (7th Cir.1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1975), all involved on-the-spot arrests of the person who took delivery of the item in the airport.

Though the majority states that it does not intend to give the government the "general right to make a warrantless search of a private warehouse or dwelling for the purpose of terminating a controlled delivery," Majority opinion *ante* at 761, that seems to be precisely the effect of its ruling. No reasonable argument could be advanced that there were exigent circumstances here. No reason appears why the agents could not simply have arrested Singh and his helpers, locked and guarded the warehouse, and obtained a search war-

rant before entering. There was no evidence that anyone was inside after the arrests were made; there was ample advance time to gather enough law enforcement agents to make arrests, secure the premises, and obtain a warrant. Indeed, in its brief on appeal, the government describes this course as one of the "practical choice[s]" that were available to the agents. (Government's brief on appeal at 39.) I would conclude that neither the law nor the facts support the majority's ruling that the agents' entry into Singh's warehouse and search of the crates there without a warrant were lawful.

B. *No Exception to the Exclusionary Rule Justified the Refusal To Suppress*

Evidence obtained through an unconstitutional search and seizure is generally excluded from evidence in order to deter law enforcement officials from ignoring the Fourth Amendment's warrant requirement. *See Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963). There are three commonly advanced exceptions to the exclusionary rule, *i.e.,* the "attenuation," the "independent source," and the "inevitable discovery," doctrines, *see United States v. Crews,* 445 U.S. 463, 470, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), that may be applicable to avoid the suppression of the unlawfully obtained evidence. The "attenuation" doctrine may be applied when the causal link between the unlawful act and the seizure of the evidence was so long or tortuous that suppression of the evidence is unlikely to have the effect of deterring future violations of the same type. *See, e.g.,* 3 W. LaFave, *Search and Seizure* § 11.4(a), at 615–16 (1978); *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). The "independent source" doctrine may be applied when the evidence was obtained by means of an untainted act and hence there is no real "but for" connection between the illegality and the acquisition of the evidence. *See, e.g., United States v. Crews,* 445 U.S. at 475, 100 S.Ct. at 1252 (evidence obtained through untainted infor-

mation gained prior to illegality should not be suppressed). The "inevitable discovery" doctrine is, in a sense, a variation of the independent source doctrine, and has been applied when the court believed that, in the absence of the illegality, law enforcement officers would plainly have come upon the evidence in the course of their lawful operations. *See, e.g., United States v. Andrade,* 784 F.2d 1431, 1433 (9th Cir.1986) (unlawfully seized evidence that would inevitably have been discovered in a lawful routine inventory search should not be suppressed). In the present case, each of these three doctrines has been invoked by the district court or the government, or both.

In denying Singh's motion to suppress the evidence found in the warehouse, the district court appears to have relied on the attenuation and inevitable discovery exceptions. Its rationale was stated as follows:

> [A]lthough the agents' entry into the warehouse without a warrant appears to have been illegal, it cannot be said that evidence with respect to the contents of those packages which were inside the warehouse was obtained as a result of this illegality. The container in its entirety had already been seized, and its contents would inevitably have had to be inventoried and inspected before its release to anyone. Whether simply as a matter of causation or application of the inevitable discovery rule, no suppression is required in the circumstances here presented by reason of the agents' wrongful entry into the warehouse.

October 1 Order at 11 (footnote omitted). The government, on the other hand, expressly disclaims reliance on the inevitable discovery doctrine but invokes the attenuation and independent source doctrines. I am unable to conclude that any of these exceptions justified refusing to suppress the evidence seized from the warehouse.

As to the attenuation doctrine, I have considerable difficulty with the view that the causal link here between the illegality and the discovery of the evidence was anything other than short, straight, and un-

leavened. The agents entered the warehouse unlawfully and promptly conducted their warrantless, unlawful search of the crates that had been in the shipping container. They thereby found some two tons of hashish. None of the crates that were moved into the warehouse had previously been searched; hence the agents did not know what was in any crate until they searched. The discovery of the narcotics in 75 of the 209 crates in the warehouse was the direct result of the unlawful search.

I see no greater merit in the government's contention that suppression was properly denied on the theory that the agents had an independent source for their discovery of the narcotics in the warehouse. In support of this contention, the government argues that the agents had already "obtained" that evidence in the initial border search of the shipping container. This argument vastly overstates the case. What the agents had gained in the initial search of the single crate they opened at the port was knowledge of the contents of that one crate and probable cause to believe that other crates contained narcotics. They did not acquire—prior to their unlawful search—either knowledge or evidence of the contents of the crates in the warehouse. Their actual knowledge that crates taken from the container to the warehouse contained narcotics was obtained during and by means of the unlawful search. I would conclude that the independent source doctrine is inapplicable.

Finally, I would reject the district court's invocation of the inevitable discovery doctrine. The court's rationale was that the crates inside· the warehouse had been seized when the agents seized the container and that the container's "contents would inevitably have had to be inventoried and inspected before its release to anyone." Had the shipping container and its contents remained intact, or had the contents remained in the constructive custody of the agents, I would agree that they would have been inventoried and the narcotics discovered. But the contents of the shipping container did not remain intact or within the agents' lawful reach. As the agents stood

and watched, some 80% of the crates in the container were removed from the container and placed in an area into which the agents had no right to enter. In allowing this to occur, the agents yielded dominion and control of those crates, and there was no longer a basis on which to expect them to be inventoried.

Nor do I see any other sound basis for admitting the warehouse evidence. It is true that since the agents had probable cause to believe that the crates taken from the container to the warehouse contained narcotics, they could surely have obtained a search warrant that would have led to the discovery of the narcotics. The Fourth Amendment, however, required that the agents obtain the warrant before entering and searching the warehouse, and there apparently was no reason why the agents could not have secured the warehouse and searched it after they obtained a warrant. The government has made no argument, either here or in the district court, based on any supposed exigency in the circumstances. Rather, the government tells us that the agents simply viewed it as a "practical choice ... whether to close and secure the doors of the storehouse and obtain a search warrant prior to recovering the crates or whether to reclaim those items that the agents considered were already seized by them." (Government's brief on appeal at 39.) This is little better than an argument that, as a matter of practicality, if there is probable cause to obtain a warrant, there is no point in waiting for one. Such selection of a "practical choice" that violates reasonable expectations of privacy, in preference to the principled choice that does not, is precisely what the exclusionary rule is designed to deter. Acceptance of the government's "practical choice" argument can only encourage warrantless entries into private homes and buildings at the end of any controlled delivery of contraband or evidentiary items, or indeed encourage such entry whenever there is probable cause for believing that evidence will be found within. In short, upholding the refusal to suppress on this basis has the effect of " 'sanc-

tion[ing] the very misconduct the exclusionary rule was intended to proscribe.' " *United States v. Alvarez-Porras,* 643 F.2d 54, 65 (2d Cir.1981).

In sum, I agree with the district court that the warrantless entry, search, and seizure were unlawful, but I conclude that no exception to the exclusionary rule justified the court's refusal to suppress the evidence seized in that search.

## C. *The Harmless Error Analysis*

It may well be, as the majority concludes, that, since the evidence against Singh included a ton of hashish and 20 pounds of heroin found in crates that remained outside the warehouse, the jury would have convicted Singh even if the evidence seized from the warehouse had been suppressed. I am not as convinced as the majority that any error in failing to suppress was harmless, however, for that evidence must be considered in light of Singh's defense at trial.

As the *Illinois v. Andreas* Court noted, "the mere fact that the consignee takes possession of the container would not alone establish guilt of illegal possession or importation of contraband. The recipient of the package would be free to offer evidence that the nature of the contents w[as] unknown to him...." 463 U.S. at 769 n. 3, 103 S.Ct. at 3323 n. 3. The entire thrust of Singh's defense at trial was that he did not know that narcotics were in the crates shipped to him, that he had somehow been a dupe for others. He testified in his own behalf that he was ignorant of the unlawful contents of the crates and called two other witnesses whose testimony was intended to buttress that position.

In its summation, the government belittled Singh's defense by pointing out that some two tons of hashish, worth $8 million wholesale, had been found inside the warehouse and arguing that it defied reason to believe that anyone would allow such a large quantity of narcotics to be placed in Singh's warehouse without Singh's knowledge. The prosecutor framed the issue this way:

The issues in this case are very simple. The issues isn't [*sic*] about whether or not Mr. Singh imported these drugs. He imported them.... The issue isn't, did he have possession of them. He had *possession of them....*

What is his defense? His defense is, well, I didn't know. I didn't know. I have no idea how all of this Hashish and heroin got into my shipment.

Urging the jury to use its reason and common sense, the prosecutor asked:

Was this hashish going to walk out of this storeroom and go to some other owner? Or ... [was] somebody going to break into the storeroom ... and find the crates and gather them back up and run off with them without [Singh] knowing?

Given the nature of the defense and the government's use of the fact that narcotics were found in the warehouse to rebut it, I am unprepared to say that it is clear beyond a reasonable doubt, *see Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), that the refusal to suppress was harmless.

I would vacate the judgment of conviction and remand for a new trial.