Shakim HARRIS, Petitioner–Appellant,

v.

Wayne BARKLEY, Superintendent,
Riverview Correctional Facility,
Respondent–Appellee.

Docket No. 99–2177.

United States Court of Appeals,
Second Circuit.

Argued Oct. 22, 1999.

Decided Jan. 19, 2000.

Jonathan Garelick, The Legal Aid Society, New York, NY (Richard Joselson, on the brief), for Petitioner–Appellant.

Shulamit Rosenblum, Assistant District Attorney, Kings County, Brooklyn, N.Y. (Charles J. Hynes, District Attorney and Roseann B. MacKechnie, Assistant District Attorney, of counsel), for Respondent–Appellee.

Before: KEARSE, MINER, and CABRANES, Circuit Judges.

PER CURIAM:

Following a jury trial in the Supreme Court of the State of New York, Kings County, petitioner Shakim Harris was found guilty in March 1992 of two counts of first degree robbery and two counts of second degree robbery in connection with the June 28, 1990 holdup of a Brooklyn grocery. Harris now seeks the writ of habeas corpus pursuant to 28 U.S.C. § 2254, claiming that the conviction was obtained in violation of his constitutional rights. Specifically, Harris asserts that he was denied his Fifth Amendment right to remain silent and his Fourteenth Amendment due process right to consult with his attorney, as both were defined by the Supreme Court in *Brooks v. Tennessee*, 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972), when the trial court ordered that if he was to testify he would have to do so prior to the last defense witness, who was not available until the next day. We write to reiterate our earlier conclusion that *Brooks* does not constitute a general prohibition against a trial judge's regulation of the order of trial in a way that may affect the timing of a defendant's testimony, and to decline petitioner's invitation to expand the rule of *Brooks* to so limit the traditional, broad authority of a presiding judge to set the trial schedule. Accordingly, we hold that the trial court did not commit *Brooks* error and we affirm the judgment of the United States District Court for the Eastern District of New York (Reena Raggi, *Judge*) denying the petition for habeas corpus.

## I.

In her Memorandum and Order of January 25, 1999, Judge Raggi carefully reviewed the record of the state court proceedings as well as the parties' submissions in presenting a detailed account of the factual background of the instant petition. *See Harris v. Barkley*, No. 97–CV–1557, 1999 WL 1273323 (E.D.N.Y. Jan.25, 1999). We assume familiarity with Judge Raggi's Order and repeat the facts herein only to the extent necessary.

## A.

On June 18, 1990, and again on June 28, 1990, two armed men robbed the Alghazali Deli (the "store") at 1119 Newkirk Avenue in Brooklyn. The first robbery occurred at approximately 11:15 p.m., when the two men, who had been in the store about fifteen minutes earlier, returned and drew guns.[1] Store employees Saleh Alghazali ("Alghazali"), his wife Lisa Ali, and cousin Saleh Hassan subsequently identified the men as Harris and his co-defendant, Mark Morgan. As the robbery began, Morgan struck Alghazali repeatedly about the head with a gun while Harris ordered Hassan at gunpoint to open the cash register. Harris then emptied the register, taking approximately $500. After ordering everyone to the floor, the robbers left the store. As soon as they left, Alghazali commented to the others that he was grateful that the robbers had not discovered the $5000 cash he had on his person to pay for a beer and cigarette delivery expected the next day. The robbers reentered the store almost immediately thereafter, holding at gunpoint a man who had been using the public telephone just outside. They took the $5000 cash from Alghazali, again ordered everyone to the floor, and exited.

Ms. Ali promptly called the police, and officers arrived at the store within fifteen minutes. The employees told the officers of the $500 loss from the register, but not the subsequent seizure of $5000 from Alghazali. Ali further stated that both robbers were black men, approximately twenty-five years old, and 5'8" tall. In fact, Morgan was twenty-five years old and 5'10" tall while Harris was eighteen years old and stood 5'8". Ali and Alghazali also visited the police station the next morning,

---

1. While the District Court stated that the robbers initially entered the store at 11:00 a.m., both sides agree that the events occurred late in the evening.

at which time Ali reported the additional $5000 loss.

Only ten days later, on June 28, 1990, at approximately 11:20 p.m., Morgan and Harris returned to the store, and Harris entered to purchase a frozen fruit bar. Ali, Hassan, and Mussa Alghazali ("Mussa"), another employee, were in the store at the time, along with customers Ricardo Dunbar, Sam Keckis, and Alan Heuer. Outside the store, Morgan pulled a gun on Alghazali and led him inside, by which time Harris had brandished his weapon and announced another holdup. Having directed Mussa to open the cash register, Harris removed about $200. The robbers then forced each person in the store to empty his pockets and surrender any money on his person. After ordering everyone to the floor, the robbers fled.

Ali called the police almost immediately after the robbers exited, while Keckis ran to the corner and flagged down a passing police cruiser in which Officers Paul DiGiacomo and Robert Bush were patrolling. After Alghazali identified the robbers, who were fleeing on bicycles, the police joined in pursuit. The men split up, but soon were apprehended.

## B.

Trial commenced on January 27, 1992. The prosecution presented seven witnesses: Alghazali, Ali, Hassan, Mussa, Heuer, and Officers DiGiacomo and Bush. When the prosecution rested on March 2, the Court noted that it previously had instructed each defendant to have all witnesses available that day. While Morgan rested without presenting evidence, Harris informed the Court that he intended to call Detective James Treval, who had interviewed Alghazali, Ali, and Hassan on June 21, 1990, and Officer Michelle Magidson, who had conducted the interviews at the store immediately after the June 18 robbery. The Court then noted: "I understand that there has been a problem with one police officer [Magidson] who was not given a notification and who is on his regu-

lar day off for today." The Court indicated that it would allow Magidson, who had not been subpoenaed, to testify the following day; however, the Court ordered Harris to proceed immediately with the remainder of his defense, including his own testimony if he chose to take the stand:

> Any other witnesses that defense calls, the Court and court personnel are here and willing to stay until the end of the day. So there's no misunderstanding, counselor, if your client chooses to testify, he makes that decision today and he testifies today. Tomorrow morning we'll hear from one witness [i.e., Magidson].

Counsel responded:

> My client has not made up his mind, nor am I in a position to advise him whether or not to testify until the other witnesses have testified.
>
> . . . .
>
> We have a police officer who will be in tomorrow morning. At the time when his testimony is complete, . . . my client will be in a position to make up his mind. He's not in such a position now, and I object to being forced to make a decision, which is a decision of constitutional gravamen and constitutional importance, upon this kind of pressure.

Unmoved, the Court replied:

> The court is exercising its discretion. You have sat here, you know your case. The People have just rested. If your client chooses to testify, he testifies today. It's very simple.
>
> I can direct, I can decide to call witnesses out of turn. I understand you have [a] preference that he be the last one to testify, but I am telling you in this trial you don't have that luxury. If he wants to testify, he will testify today and that's it.

Defense counsel renewed his objection, which the Court again overruled.

Following the Court's ruling, Harris called Detective Treval to testify. He not-

ed that at the June 21 interview, Ali, Al-ghazali, and Hassan had described the robbers as about twenty-five years old. Harris then took the stand in his own defense to disclaim involvement in either robbery. He did not recall his where-abouts on the night of June 18, but claimed that he did not rob anyone and had not even met Morgan at that time. Harris further stated that he was partici-pating in a dice game with Morgan at the time of the June 28 robbery, and that after the game Harris had returned to the stoop where he was arrested.

The following day, March 3, Magidson appeared and testified briefly about his June 18 interview of Ali; he noted that she had described the robbers as black men, about twenty-five years old, and 5'8" tall. Magidson also stated that on the night of the robbery Ali had reported only a loss of $500, but that she apparently had notified the police of the $5000 loss the next day.

The jury acquitted both defendants of all charges arising out of the June 18 robbery, but convicted each defendant in connection with the June 28 robbery on two counts of first degree robbery, in vio-lation of New York Penal Law § 160.15(4), and two counts of second degree robbery, in violation of New York Penal Law § 160.10. On June 2, 1992, Harris was sentenced to concurrent prison terms of seven to twenty-one years on the first degree robbery conviction and four to twelve years on the second degree convic-tion.

### C.

The Appellate Division affirmed Harris's conviction on direct appeal, summarily re-jecting his assertion that the trial court had committed error under *Brooks*. *See People v. Harris*, 224 A.D.2d 712, 638 N.Y.S.2d 921 (2d Dep't 1996). Harris's subsequent motion for leave to appeal to the New York Court of Appeals was de-nied. *See People v. Harris*, 88 N.Y.2d 848, 644 N.Y.S.2d 694, 667 N.E.2d 344 (1996). On April 1, 1997, Harris filed the instant

petition for the writ of habeas corpus pur-suant to 28 U.S.C. § 2254. The District Court denied the petition, but granted a certificate of appealability on the Court's finding that there was no *Brooks* error or, alternatively, that any error was harmless. This timely appeal followed.

### II.

In *Brooks*, the case on which Harris primarily relies, the Supreme Court invali-dated a Tennessee statute that had re-quired a criminal defendant who wished to testify in his own defense to do so before any other defense testimony was heard. *See* 406 U.S. at 606, 92 S.Ct. 1891. As the Court recognized, the statute was designed to balance a criminal defendant's constitu-tional right to be present at all phases of his trial with ."the ancient practice of se-questering prospective witnesses in order to prevent their being influenced by other testimony in the case." *Id.* at 607, 92 S.Ct. 1891. Nevertheless, the Court invalidated the statute on the ground that the rule was "an impermissible restriction on the defen-dant's right against self-incrimination, 'to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence.'" *Id.* at 609, 92 S.Ct. 1891 (quoting *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)) (ellipsis in original). The Court explained:

Although a defendant will usually have some idea of the strength of his evidence, he cannot be absolutely certain that his witnesses will testify as expect-ed or that they will be effective on the stand....

Because of these uncertainties, a de-fendant may not know at the close of the State's case whether his own testimony will be necessary or even helpful to his cause. Rather than risk the dangers of taking the stand, he might prefer to remain silent at that point, putting off his testimony until its value can be real-istically assessed. Yet, under the Ten-

nessee rule, he cannot make that choice in the unfettered exercise of his own will. [The statute] exacts a price for his silence by keeping him off the stand entirely unless he chooses to testify first. This, we think, casts a heavy burden on a defendant's otherwise unconditional right not to take the stand. The rule, in other words, cuts down on the privilege to remain silent by making its assertion costly.

*Id.* at 609–11, 92 S.Ct. 1891 (internal quotation marks, parentheses, and footnotes omitted).

The Court also held that the statute violated the Fourteenth Amendment. The Court found that a criminal defendant's due process right to "the guiding hand of counsel at every step in the proceedings against him" extends to the "important tactical decision" of whether to testify on his own behalf. *Id.* at 612, 92 S.Ct. 1891 (internal quotation marks omitted). The Court noted:

> By requiring the accused and his lawyer to make that choice without an opportunity to evaluate the actual worth of their evidence, the statute restricts the defense—particularly counsel—in the planning of its case. Furthermore, the penalty for not testifying first is to keep the defendant off the stand entirely, even though as a matter of professional judgment his lawyer might want to call him later in the trial. The accused is thereby deprived of the "guiding hand of counsel" in the timing of this critical element of his defense.

*Id.* at 612–13, 92 S.Ct. 1891. The Court concluded: "While *nothing we say here otherwise curtails in any way the ordinary power of a trial judge to set the order of proof,* the accused and his counsel may not be restricted in deciding whether, and when in the course of presenting his defense, the accused should take the stand." *Id.* at 613, 92 S.Ct. 1891 (emphasis added).

Notwithstanding Harris's argument to the contrary, and some of the broad language the Court employed in *Brooks,* we conclude that *Brooks* does not constitute a general prohibition against a trial judge's regulation of the order of trial in a way that may affect the timing of a defendant's testimony. In fact, we already have rejected the broader interpretation of *Brooks* that Harris espouses. In *United States v. Singh,* 811 F.2d 758 (2d Cir.1987), we found that a trial judge had acted within his discretion in refusing to accept the proffered testimony of non-party witnesses unless and until the defendant had testified and established a proper foundation. *See* 811 F.2d at 762. Rejecting the contention that the effect of the trial court's ruling was to force the defendant to testify before any other defense witness, in violation of his rights to counsel and due process as defined in *Brooks,* we noted that unlike in *Brooks,* the trial court in *Singh* had not applied a categorical rule and indeed had not compelled the defendant to testify at all. *See Id.* As we reiterated:

> Our cases have consistently recognized the important role the trial judge plays in the federal system of criminal justice. The judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. A criminal trial does not unfold like a play with actors following a script; there is no scenario and can be none. The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process. To this end, he may determine generally the order in which parties will adduce proof; his determination will be reviewed only for abuse of discretion.

*Id.* at 762–63 (quoting *Geders v. United States,* 425 U.S. 80, 86, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976)) (internal quotation marks, citations, and brackets omitted).

In the circumstances of the instant case, as in *Singh,* the trial judge did not violate *Brooks* in ruling that Harris had to

testify (if he chose to testify at all) before a non-party witness whose appearance was delayed. Indeed, the state trial court's ruling in Harris's trial is readily distinguishable from *Brooks*. First, the disputed ruling in this case was based not on a statute purporting to establish a categorical rule that a defendant testify first or not at all, but rather on the trial court's "broad power to cope with the complexities and contingencies" of trial. *Id.* The distinction between a categorical rule and a limited scheduling directive in the course of trial was dispositive in *Singh. See* 811 F.2d at 762–63. Even in *Brooks,* the Supreme Court clearly expressed its unwillingness to "curtail[ ] in any way the ordinary power of a trial judge to set the order of proof." 406 U.S. at 613, 92 S.Ct. 1891. We view the trial court's ruling as nothing more than an exercise of this "ordinary power," quite unlike the statute that the Supreme Court invalidated in *Brooks. See May v. Collins,* 948 F.2d 162, 167 (5th Cir.1991) (explaining that *Brooks* supports finding "a constructive denial of counsel only where a *government rule* affirmatively forces counsel to make a choice he or she might not otherwise make in the context of a particular case" (emphasis added)).

Furthermore, Harris, unlike Brooks, bears primary responsibility for the situation that engendered the ruling of which he now complains. It is undisputed that Harris failed to subpoena Officer Magidson or otherwise secure his appearance on March 2; the order of defense witnesses became an issue only because of this failure to comply with the state trial court's prior instruction to have all defense witnesses available on that date. In fact, the trial court could have excluded Magidson's testimony altogether and forced Harris to rest his case. *See, e.g., United States v. Beverly,* 5 F.3d 633, 641 (2d Cir.1993) (finding that it is within a trial judge's discretion to deny a request for a continuance where the final two defense witnesses were not present at trial that day). We decline Harris's invitation to extend *Brooks* to find that the Court's attempt to accommodate Harris's desire to present Officer Magidson's testimony, despite Harris's failure to secure the witness in accordance with prior instructions, converted the normal exercise of judicial authority into a deprivation of constitutional rights.

Finally, the instant matter is distinguishable from *Brooks* because Harris did not testify first, but rather was the second of three defense witnesses. Magidson's brief testimony, offered to impeach Ali, was largely cumulative of Treval's earlier testimony (and, indeed, of Ali's as well). After Treval testified, Harris's counsel could weigh the impact of the testimony against the risks associated with Harris's taking the stand in his own defense. Thus, unlike Brooks and other defendants tried under the invalidated Tennessee statutory regime, Harris was not forced to make the "important tactical decision" of whether to testify without the informed advice of counsel. *Brooks,* 406 U.S. at 612, 92 S.Ct. 1891.

We conclude that the trial court's ruling that Harris had to testify on March 2, if at all, was a proper exercise of its broad authority to set the trial schedule. As the factual basis of the instant petition is materially distinct from *Brooks,* we decline to find that this ruling deprived Harris of his right to remain silent or of his due process right to counsel. *Cf. Singh,* 811 F.2d at 762–63; *May,* 948 F.2d at 167; *United States v. Leon,* 679 F.2d 534, 538 (5th Cir.1982) (holding that where defendant already had decided to testify, no *Brooks* error occurred when the trial court forced the defendant to testify before a witness that was delayed and could not appear until following day, and stating that the trial judge possesses "substantial latitude" to "keep the trial from stalling in midafternoon"). *But cf. United States v. Luce,* 713 F.2d 1236, 1241 n. 4 (6th Cir. 1983) (citing *Brooks* for the proposition that a defendant "may not constitutionally be forced to decide whether he will testify

at any point before the close of his defense" (dicta)).

## III.

For the reasons stated above, we conclude that petitioner was not deprived of any constitutional right, and therefore affirm the judgment of the District Court denying the petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254.