76 P.3d 612

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Sydney T. KIDO, Defendant–Appellant.**

**No. 24887.**

Intermediate Court of Appeals of Hawai'i.

· Aug. 22, 2003.

Mary Ann Barnard, on the briefs, for defendant-appellant.

Daniel H. Shimizu, Deputy Prosecuting Attorney, City & County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by LIM, J.

Sydney T. Kido (Kido) appeals the circuit court of the first circuit's [1] January 8, 2002 judgment, as amended on January 15, 2002, that convicted him of promoting a dangerous drug in the third degree, a violation of Hawaii Revised Statutes (HRS) § 712–1243 (1993) [2] (Count I), and unlawful use of drug paraphernalia, a violation of . HRS § 329–43.5(a) (1993) [3] (Count II). Because the court directed, over Kido's objection, that he testify before his other defense witness, and because this constitutional error was not harmless beyond a reasonable doubt, we must set aside the amended judgment. But because there was sufficient evidence to support the convictions, we vacate and remand for a new trial.

1. The Honorable Sandra A. Simms, judge presiding.

2. Hawaii Revised Statutes (HRS) § 712–1243(1) (1993) provides that "[a] person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount."

3. HRS § 329–43.5(a) (1993) provides, in relevant part:

## I. Background.

Kido's two-day jury trial started on June 14, 2001. Honolulu police officer Russell Pereira (Officer Pereira) testified first for the State. Officer Pereira remembered that on January 26, 2001, at about 6:30 a.m., he was on uniform patrol in Chinatown when he noticed Hector Arroyo Garcia (Garcia), who was "wanted in connection with a theft case[,]" sitting on a curb fronting 1169 Maunakea Street. "Mr. Kido was to the left of him and asleep at the time." Officer Pereira walked over from his police sedan and started questioning Garcia. During the interrogation, Officer Pereira noticed Kido get up— "probably from the loud [police] radio or just my voices [ (sic) ] talking with [Garcia.]" From no more than ten feet away, Officer Pereira saw that Kido had his left fist clenched. Kido then moved to the side and dropped something onto the ground. "There's a distinctive clink like a glass hitting pavement." Kido immediately positioned his left foot over the object, "possibly [to] smash the object[,]" but Officer Pereira grabbed the cuff of Kido's pant leg, lifted Kido's foot and recovered a glass pipe about four inches long from the pavement. Officer Pereira's training and experience indicated that it was a crack (rock cocaine) pipe. Kido protested that the pipe was not his, and invited Officer. Pereira to test it for fingerprints.

On cross-examination, Officer Pereira testified that he parked his patrol car on the same side of the street the two men were sitting. It was perhaps closer to 6:00 a.m. at the time, and twilight, but with street lamps providing some illumination. "It is not necessarily well-lit but visible enough." Officer Pereira acknowledged that people were talking and police radios were on during the encounter, but maintained that he could dis-

It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter.

tinctly hear the "pink" of the glass pipe hitting the pavement. He confirmed that he did not see anything sticking out of either side of Kido's fist before Kido dropped the pipe. Officer Pereira knew of Kido's habit of carrying a backpack and a fanny pack, but could not remember whether Kido had either with him at the time of the bust. Officer Pereira remembered asking another police officer who had arrived at the scene to dust the pipe for latent fingerprints. Officer Pereira confirmed that no source of ignition for the pipe—a lighter or matches—or other contraband was recovered from Kido.

On redirect examination, Officer Pereira informed the jury that police radio transmissions are a little louder than conversational level, but intermittent and not constant. He recalled that in four-and-a-half years of police work and numerous drug cases, he had never been able to extract a latent fingerprint from a glass pipe.

Honolulu police officer Jeffrey Nagai (Officer Nagai) remembered that he went to 1169 Maunakea Street that morning to back up Officer Pereira. While he was watching Officer Pereira interrogate Garcia, Officer Nagai heard "a tinking sound" from Kido's vicinity. When he looked in that direction, he saw Officer Pereira move Kido's leg. Officer Nagai illuminated the scene with his flashlight and saw the glass pipe on the pavement where Kido's left foot had been. As for the lighting conditions at the time, Officer Nagai remembered that it was, "like dawn. It was still a little dark. Some light was—could see with street lights[.]" On cross-examination, Officer Nagai remembered that Kido had a fairly large backpack with him at the time, as well as a fanny pack.

Honolulu police officer Craig Miki (Officer Miki) related that he, too, was dispatched to back up Officer Pereira on the morning of January 26, 2001. When he arrived, he saw Officer Pereira talking to Kido, with Officer Nagai "covering" and Garcia sitting on the curb. There was no one else present. Officer Pereira told Officer Miki what had just happened and showed him a glass pipe, "the kind of pipe used to smoke crack cocaine[.]" Officer Pereira asked Officer Miki to dust the pipe for latent fingerprints. Officer Miki did,

but all he could get were smudges. He related that a fingerprint on glass is very easily smudged or smeared. Officer Miki noticed "white residue inside of [the pipe] and a brown mesh stuffed at the end of it." The white residue was very easy to see. When shown the glass pipe in court, Officer Miki remarked that it looked cleaner to him than when he first saw it. It was Officer Miki who submitted the pipe to the police evidence room. On cross-examination, Officer Miki maintained that in his six years of police work and his many drug cases, he had never been successful in lifting fingerprints from a glass pipe.

After stipulating with the defense as to the chain of custody of the glass pipe, from Officer Miki to the police criminalist, Shirley Brown (Brown), the State called Brown to the witness stand. Brown testified that she removed and analyzed the residue in the pipe and determined that it contained cocaine. The residue weighed 0.009 grams. Brown explained that the glass pipe looked "almost clean" in court precisely because she had removed the residue with solvent in order to do her analysis. On cross-examination, Brown agreed that a gram of crack cocaine is about the size of a marble. She also acknowledged that the tests she performed were not capable of determining how much of the residue was cocaine and how much was other substances. On redirect examination, Brown confirmed that, before she analyzed the residue, she could see the "white brownish coating ... more or less throughout the pipe."

After Brown's testimony, court adjourned for the day. The next day, court reconvened late due to the absence of a juror. An alternate juror was seated, and the State then rested. Defense counsel tendered a motion for judgment of acquittal as to Count I, which was denied. For his first witness, Kido called Garcia, but the State requested a bench conference. The following transpired:

[DEPUTY PROSECUTING ATTORNEY (DPA)]: Hector Garcia is here. I made sure the sheriffs retained him so that we would have him available. Need to call him up. He's being called in cellblock.

THE COURT: I know. Why didn't you do that before. You knew you were going to call him.

Okay. Okay.

THE CLERK: I have to see if he's available first.

THE COURT: You have another witness. We have to make arrangements. I thought he had done it.

THE LAW CLERK: He has a matter on the seventh floor.

[DEFENSE COUNSEL]: He's here.

THE COURT: I know he's here logistically. Come on. Don't call him unless he's outside. Understand that.

You check. You know where he is.

[DEFENSE COUNSEL]: In the building.

THE COURT: That's not good enough. Call the other witness while we check. Any other witness?

[DEFENSE COUNSEL]: The defendant.

THE COURT: Okay, do him first then Mr. Garcia.

[DEFENSE COUNSEL]: For the record, I object to that.

THE COURT: Okay.

THE LAW CLERK: [The tardy juror] is here.

THE COURT: Okay.

[DPA]: I have—I have no problem. I feel it be better they call Hector [Garcia] first.

THE COURT: Counsel, counsel, yesterday you indicated that you were going to be calling him. The court made arrangements. He's here for some other matters. Obviously, came in today checked with you to see if you were going to call him. You said you were not.

[DPA]: Yeah.

THE COURT: That's fine. Entitled to do that.

Waiting for a juror in the interim. If you want to call him the first matter is to find out where he is and make arrangements.

Defendant, you call him first. You knew he was going to rest. You do that. That

be fine. We're wasting time. 45 minutes to work on getting—finding exactly what the status of it is. I'm not going to delay this jury again try to find out where he is and see if he's even available to bring up right now. You call another witness.

And [the tardy juror] is here. We've covered some of the things. I'll have to excuse her. She's arrived at 9:45. Okay.

(Bench conference concluded.)

THE COURT: In light of Mr. Garcia's not presently being available, why don't you call your next witness.

[DEFENSE COUNSEL]: Thank you.

At this time, Your Honor, the defense calls Sydney Kido, the defendant.

Kido testified that he had been homeless for about five weeks before the January 26, 2001 incident. He had been homeless—"[o]n and off"—before. That morning, he went to 1169 Maunakea Street to see a friend who worked at the Dalisay Restaurant at that address to borrow forty dollars. Kido got there a little after 6:00 a.m. and dozed off. He awoke when he heard voices. "When I woke there were two individuals around this guy named Kimo and another person Hector Garcia." He had seen Kimo around on the streets but knew little else about him. Garcia he was better acquainted with, but not by much. Kido did not talk to the two men. He just went back to sleep. Kido had his "tote bag" on the ground beside him. Next to this "rather large" tote bag was a backpack, which Kido assumed belonged to Garcia, who was standing over it to Kido's left. Kido also had a fanny pack and a watch on.

Kido awoke a second time when he heard someone yelling "get up and get out." In front of him were Officers Pereira and Nagai. "Basically I awoke and the thing is Russell Pereira—this is—he came directly to me and reached down to the ground and picked up a glass pipe[.]" The pipe was on the ground to the left of Kido, just behind his tote bag and the backpack. In response to his counsel's queries, Kido disclaimed ownership of the pipe. He had never seen that pipe before. He denied holding it in his hand while he slept. The first time he was aware the pipe was there was when Officer

Pereira reached down and picked it up. Kido mentioned that Officers Pereira and Nagai had arrived in three-wheeled, Cushman police vehicles. He maintained, under persistent questioning from his counsel, that it was 6:40 a.m. when Officer Pereira recovered the pipe, and that it was daylight—"The sun was already up."

On cross-examination, Kido denied that he was a crack cocaine user at the time of the encounter. When asked whether he had ever used crack cocaine, Kido admitted, "I've tried it." Kido informed the jury that Kimo was standing to his right when the police officers confronted the three of them. Later, however, on redirect examination, Kido claimed that when he woke up the second time, Kimo was no longer there.

Then Garcia testified. He remembered being in front of the Dalisay Café on January 26, 2001. He was sitting next to Kido, who was asleep. Another person was sitting next to Kido, but on Kido's right. When Officer Pereira approached him, Garcia got up to move, but Officer Pereira made him sit down on the street curb. "He was always harassing me." Garcia denied hearing at any time "a clinking sound of glass falling on the ground[.]" He did not see Kido holding a pipe in his hand. "Sydney was asleep during the whole time."

On cross-examination, Garcia testified that he had known Kido for five years and that they were "good friends[.]" He knew Kimo less well. Garcia denied having a backpack with him that day. "The other guy did but not me." Garcia denied placing a crack pipe next to Kido's tote bag, but claimed that Kimo did. Garcia denied carrying a crack pipe that day. He admitted, however, that he is a user of crack cocaine. He maintained that Kido is as well. "We all are, yeah." Garcia confirmed that he saw Officer Pereira walk towards Kido and grab his left leg. Garcia remembered that Kimo was present at that point in time, and was still there after Kido was arrested. Garcia reiterated that Kimo had a crack pipe, and revealed that he

and Kimo had smoked the pipe while Kido was sleeping. Garcia saw the pipe in Kimo's left hand as the police were arriving.

The defense rested after Garcia's testimony. Defense counsel then renewed the motion for judgment of acquittal that she had tendered at the close of the State's case, on the same grounds. Defense counsel added, "I also submit that under the defense's case there's no prima facie case as to Count II." The motion was denied. It took the jury about forty minutes to find Kido guilty on both counts.

On June 25, 2001, Kido filed a motion for judgment of acquittal or new trial. Kido directed this motion for judgment of acquittal at Count I, arguing that the evidence was insufficient to show he knew there was cocaine in the glass pipe. Kido noted that, pipe in hand *vel non,* he was asleep at the inception of the incident; that visibility was poor at that time of the morning; and that the residue in the glass pipe was *de minimis,* the cocaine detected therein notwithstanding. Thereupon, Kido argued:

> [A]wareness requires consciousness, visibility, and "knowability." In light of these factors, Kido could not have known he possessed cocaine. The most he could have known is that the pipe "might" still contain cocaine. This falls far short of proof beyond a reasonable doubt, and Kido's motion for a judgment of acquittal should have been granted.

Kido based his alternative motion for new trial on the court's direction, made over his objection, that he testify before Garcia on defense.

The court denied both of Kido's alternative motions at an October 23, 2001 hearing:

> [DEFENSE COUNSEL]: .... that because the court declined to allow Mr. Garcia to testify first because there was an inconvenience in terms of bringing him up to the courtroom at that time, it also would impact upon my client's rights under Tachibana [4] because if he had the opportunity

4. *Tachibana v. State,* 79 Hawai'i 226, 236, 900 P.2d 1293, 1303 (1995) ("Thus, we hold that in order to protect the right to testify under the Hawai'i Constitution, trial courts must advise criminal defendants of their right to testify and must obtain an on-the-record waiver of that right in every case in which the defendant does not testify." (Footnotes omitted.)).

to hear the other defense witness—or the defense witness first-

THE COURT: He would tailor his testimony to correspond to that? Is that what you're suggesting?

[DEFENSE COUNSEL]: No, that's not what I'm suggesting. But he'd be able to say—

THE COURT: Well, what is the problem? What difference does it make?

[DEFENSE COUNSEL]: I'd like to finish.

That he—it might impact on his decision whether or not to testify himself also. And I didn't mention that in the memo—

THE COURT: Okay.

[DPA]: Your Honor,—

THE COURT: Anything else?

[DPA]: Just briefly in response to that, Your Honor. They knew what the witness was going to say so he could have made the decision based on what [defense counsel] knew of the testimony. So I don't think that would impact on his decision.

[DEFENSE COUNSEL]: He knew generally and not the details. And the detail that was different was Mr. Garcia denied having a backpack and that sort of thing.

THE COURT: Okay. All right. The Court's reviewed the memoranda of counsel in support of the motion for judgment of acquittal or in the alternative for new trial, of course reviewing all that and of course reviewing all the evidence presented in the case, the Court is satisfied there is no basis to grant the motion for judgment of acquittal. The issue is not a legal issue for the jury; it's a pretrial issue.

As far as the other matters covered by counsel, um, the Court is—doesn't think any of those matters warrant granting of a new trial so the motion's denied.

(Footnote supplied.)

## II. Discussion.

■ On appeal, Kido argues that "[r]equiring Defendant to testify first, before the other defense witness, [was a] violation of his due process rights and his right against self-incrimination[.]" Opening Brief at 13. The State concedes this was error, and we confirm that it was.[5]

"We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case, and, thus, questions of constitutional law are reviewed on appeal under the 'right/wrong' standard." *State v. Aplaca*, 96 Hawai'i 17, 22, 25 P.3d 792, 797 (2001) (citation and some internal quotation marks omitted).

"[T]he trial court has wide discretion to control the order of proof at trial[.] *State v. Alfonso*, 65 Haw. 95, 99, 648 P.2d 696, 700 (1982)[.]" *State v. Grindles*, 70 Haw. 528, 532, 777 P.2d 1187, 1190 (1989). "The trial court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. Stated differently, an abuse of discretion occurs where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *TSA Int'l Ltd., v. Shimizu Corp.*, 92 Hawai'i 243, 253, 990 P.2d 713, 723 (1999) (brackets, citations, internal quotation marks and block quote format omitted).

In *Brooks v. Tennessee*, 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972), the United

---

5. In *State v. Hoang*, 93 Hawai'i 333, 3 P.3d 499 (2000), the supreme court explained our duty where the State concedes error:

An appellant's burden of demonstrating error in the record is consistent with Hawaii's case law and court rules. In "confession of error" cases where the prosecution "admits" to error, *see State v. Wasson*, 76 Hawai'i 415, 418, 879 P.2d 520, 523 (1994); *Territory v. Kogami*, 37 Haw. 174, 175 (1945), this court has stated that, "even when the prosecutor concedes error, before a conviction is reversed, 'it is incumbent on the appellate court [first] to ascertain ... that the confession of error is supported by the record and well-founded in law and [second] to determine that such error is properly preserved and prejudicial.'" *Wasson*, 76 Hawai'i at 418, 879 P.2d at 523 (quoting *Kogami*, 37 Haw. at 175). In other words, a confession of error by the prosecution "is not binding upon an appellate court, nor may a conviction be reversed on the strength of [the prosecutor's] official action alone." *Kogami*, 37 Haw. at 175. *Id.* at 336, 3 P.3d at 502 (brackets and ellipsis in the original).

States Supreme Court confronted a Tennessee statute which provided that, in criminal cases, "the defendant desiring to testify shall do so before any other testimony for the defense is heard by the court trying the case." *Id.* at 606, 92 S.Ct. 1891, n. 1.[6] The concern of the Tennessee legislature was the same concern the court here expressed in denying Kido's motion for new trial—that a criminal defendant could tailor his testimony to that of prior defense witnesses:

> The rule that a defendant must testify first is related to the ancient practice of sequestering prospective witnesses in order to prevent their being influenced by other testimony in the case. See 6 J. Wigmore, Evidence § 1837 (3d ed.1940). Because the criminal defendant is entitled to be present during trial, and thus cannot be sequestered, the requirement that he precede other defense witnesses was developed by court decision and statute as an alternative means of minimizing this influence as to him. According to Professor Wigmore, "the reason for this rule is the occasional readiness of the interested person to adapt his testimony, when offered later, to victory rather than to veracity, so as to meet the necessities as laid open by prior witnesses[.]" *Id.,* at § 1869.

*Id.* at 607, 92 S.Ct. 1891 (original brackets omitted). The Supreme Court did not consider this concern paramount: "Although the Tennessee statute does reflect a state interest in preventing testimonial influence, we do not regard that interest as sufficient to override a defendant's right to remain silent at trial." *Id.* at 611, 92 S.Ct. 1891 (footnote omitted). The Supreme Court explained the more pressing constitutional concern at stake:

> It must often be a very serious question with the accused and his counsel whether he shall be placed upon the stand as a witness, and subjected to the hazard of cross-examination, a question that he is not required to decide until, upon a proper survey of all the case as developed by the state, and met by witnesses on his own behalf, he may intelligently weigh the advantages and disadvantages of his situation, and, thus advised, determine how to act. Whether he shall testify or not; if so, at what stage in the progress of his defense, are equally submitted to the free and unrestricted choice of one accused of crime, and are in the very nature of things beyond the control or direction of the presiding judge. Control as to either is coercion, and coercion is denial of freedom of action.
>
> . . . .
>
> Although a defendant will usually have some idea of the strength of his evidence, he cannot be absolutely certain that his witnesses will testify as expected or that they will be effective on the stand. They may collapse under skillful and persistent cross-examination, and through no fault of their own they may fail to impress the jury as honest and reliable witnesses. In addition, a defendant is sometimes compelled to call a hostile prosecution witness as his own.

*Id.* at 608–609, 92 S.Ct. 1891 (footnote, citation, internal quotation marks and block quote format omitted). Accordingly, the Supreme Court held that the Tennessee statute "violates an accused's constitutional right to remain silent insofar as it requires him to testify first for the defense or not at all." *Id.* at 612, 92 S.Ct. 1891.

The *Brooks* Court also held that the Tennessee statute was "an infringement on the defendant's right of due process .... as imposed upon the States by the Fourteenth Amendment." *Id.* (citation and internal quotation marks omitted). The Supreme Court

---

6. During the trial, at the close of the State's case, defense counsel moved to delay petitioner's testimony until after other defense witnesses had testified. The trial court denied this motion on the basis of Tenn.Code Ann. § 40-2403 (1955), which requires that a criminal defendant "desiring to testify shall do so before any other testimony for the defense is heard by the court trying the case." Although the prosecutor agreed to waive the statute, the trial court refused, stating that "the law is, as you know it to be, that if a defendant testifies he has to testify first." The defense called two witnesses, but petitioner himself did not take the stand.
*Brooks v. Tennessee,* 406 U.S. 605, 605–606, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972) (footnote omitted).

explicated how this additional constitutional interest was implicated:

> Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right. By requiring the accused and his lawyer to make that choice without an opportunity to evaluate the actual worth of their evidence, the statute restricts the defense—particularly counsel—in the planning of its case. Furthermore, the penalty for not testifying first is to keep the defendant off the stand entirely, even though as a matter of professional judgment his lawyer might want to call him later in the trial. The accused is thereby deprived of the "guiding hand of counsel" in the timing of this critical element of his defense. While nothing we say here otherwise curtails in any way the ordinary power of a trial judge to set the order of proof, the accused and his counsel may not be restricted in deciding whether, and when in the course of presenting his defense, the accused should take the stand.

*Id.* at 612–13, 92 S.Ct. 1891.

In conclusion, and observing that "[t]he State makes no claim that this was harmless error," the Supreme Court reversed Brooks' convictions and remanded for a new trial. *Id.* at 613, 92 S.Ct. 1891 (citation omitted).

Notably, some federal and state appellate courts, presented with averments of *Brooks* error, have declined to find constitutional error, (1) where the trial court required that the defendant testify before only some of his witnesses,[7] (2) where the defendant's decision whether to testify congealed before the trial court's action,[8] and/or (3) where the defendant himself created the exigency for taking his testimony first.[9] In so holding, some of those courts have noted the distinction between the statutory directive in *Brooks* and the trial court directive before them,[10] though none have explained why the distinction makes a constitutional difference. However, those cases are factually distinguishable from ours because the choice foisted upon Kido was effectively the same choice the Tennessee statute forced upon Brooks. *See Brooks*, 406 U.S. at 610–12, 92 S.Ct. 1891; *United States v. Rantz*, 862 F.2d 808, 811–12 (10th Cir.1988) (finding *Brooks* error because the defendant was required to testify "before any other defense testimony"), *cert. denied*, 489 U.S. 1089, 109 S.Ct. 1554, 103 L.Ed.2d 857 (1989); *Cruz-Padillo v. State*, 262 Ga. 629, 422 S.E.2d 849, 851 (1992) (citing *Brooks* and holding that "the trial court violated [the defendant's] federal and state constitutional rights to remain silent and to due process by requiring him to testify before any of the other defense witnesses or not at all"). In

7. *See Harris v. Barkley*, 202 F.3d 169, 174 (2d Cir.2000) (per curiam) ("Harris did not testify first, but rather was the second of three defense witnesses"); *United States v. Singh*, 811 F.2d 758, 762 (2d Cir.1987) (where the court "merely refused to accept the proffered testimony of other witnesses until a proper foundation was laid" by the defendant's testimony), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3264, 97 L.Ed.2d 763 (1987); *United States v. Leon*, 679 F.2d 534, 538 (5th Cir.1982) (the defendant was required to testify after partial presentation of his defense "merely ... to keep the trial from stalling in mid-afternoon"); *State v. Turner*, 252 Conn. 714, 751 A.2d 372, 384 (2000) (trial court's ruling "did not force the defendant to testify prior to *any* witnesses, and affected only the order of [his] last two [ (out of seven) ] witnesses" (emphasis in the original)).

8. *See Leon*, 679 F.2d at 538 ("The record shows that counsel and [defendant] already had discussed the matter, and [defendant] had decided to testify. Thus the Court's actions did not influence the decision to testify."); *Turner*, 751 A.2d

at 384 ("there is no indication that the trial court's ruling affected [defendant's] decision to testify"); *State v. Amos*, 262 N.W.2d 435, 437 (Minn.1978) (per curiam) ("the record does not bear out defendant's contention that he might not have testified at all if he had been permitted to wait until after the missing witness had testified").

9. *See Harris*, 202 F.3d at 174 (despite the trial court's prior directive that the defendant have all of his witnesses available to testify on a date certain, the defendant failed to subpoena the police officer who ultimately testified after him; hence, the defendant "bears primary responsibility for the situation that engendered the ruling of which he now complains"); *Turner*, 751 A.2d at 384 ("*Brooks* does not apply here because the order of witnesses resulted solely from [the defendant's] late disclosure of his alibi and his own statements to the court [approving the order of witnesses].").

10. *See Harris*, 202 F.3d at 174; *Singh*, 811 F.2d at 762–63.

addition, the record contains no indication that Kido had already decided to testify in any event. Or that Kido himself created an exigency that pushed him to the head of the witness list. The delay and inconvenience that would have been occasioned by waiting to bring Garcia to the courtroom—from elsewhere in the courthouse—would have been trifling indeed.

*Brooks* was cited by our supreme court in *Grindles, supra.* There, Grindles was charged with violating the statute then extant prohibiting driving under the influence of intoxicating liquor (DUI). Over Grindles' objection, the trial court bifurcated the trial into separate hearings on the two alternative methods of proving DUI—impairment and blood alcohol content. After the State had presented its evidence on the impairment prong, Grindles refused to present any testimony until the State had presented its entire case against him, reasoning that bifurcation would violate his federal and State guarantees against self-incrimination. The trial court thereupon convicted Grindles on the impairment prong, and Grindles appealed. *Id.* at 529–30, 777 P.2d at 1188–89.

On appeal, Grindles claimed the trial court had erred in compelling him to present his testimony before the conclusion of all of the State's evidence. Without citing *Brooks,* the supreme court concluded that "the trial court's action in bifurcating the two methods of proof . . . into separate trials violated Appellant's due process right to a fair trial." *Grindles,* 70 Haw. at 532, 777 P.2d at 1190. The supreme court elaborated:

> While we have recognized that the trial court has wide discretion to control the order of proof at trial, *State v. Alfonso,* 65 Haw. 95, 99, 648 P.2d 696, 700 (1982), such discretion does not extend to the action taken by the trial judge in this case. The judge ordered Appellant to present his defense to the DUI charge before hearing all of the State's evidence against him. We find that such a departure from the well-established order of proof in criminal

cases is fundamentally unfair and is not a matter within the discretion of the trial court.

*Id.* Thereupon, the supreme court held that "in a trial for violation of [the then-extant DUI statute], where the State intends to present proof under both [methods of proving the offense], the defendant has an absolute right to hear all of the State's evidence against him prior to putting on his defense." *Id.*

The *Grindles* court had occasion to cite *Brooks* in connection with an additional holding: "We further find that the trial court's actions in this case improperly burdened Appellant's right against self-incrimination in violation of the fifth amendment to the United States Constitution and article I, section 10 of the Hawaii Constitution." *Grindles,* 70 Haw. at 532, 777 P.2d at 1190. In this regard, the supreme court quoted part of the passage from *Brooks* that we quoted above (*Brooks,* 406 U.S. at 608, 92 S.Ct. 1891) in connection with the violation of Brooks' right to remain silent. *Grindles,* 70 Haw. at 532–33, 777 P.2d at 1190–91. On that basis, the supreme court gleaned that "[i]mplicit in the [*Brooks*] Court's decision is that the defendant has an absolute right to hear the *State's* case against him before deciding whether or not to testify in his own behalf." *Grindles,* 70 Haw. at 533, 777 P.2d at 1191 (emphasis in the original).

In conclusion, and consistent with the issue framed and the approach it took throughout its opinion, the *Grindles* court held that "the Appellant was entitled to have the State present its entire case against him under [the then-extant DUI statute] before presenting any evidence in his defense or deciding whether or not he himself should take the stand." *Id.* Without discussion of harmless error *vel non,* which presumably would have been gratuitous under the unique circumstances of the case, the supreme court vacated Grindles' DUI conviction and remanded for a new trial. *Id.* at 535, 777 P.2d at 1192.[11]

---

11. In formulating its colloquy requirement in *Tachibana, supra,* our supreme court touched upon the order of defense witnesses, obliquely:

> [T]he defendant may not be in a position to decide whether to waive the right to testify until all other evidence has been presented. Accordingly, the ideal time to conduct the col-

We now hold in this case, and on its particular facts, that the court abused its discretion in directing, over Kido's objection, that he testify before his other defense witness. The error was of constitutional dimension, a violation of Kido's right against self-incrimination under the fifth amendment to the United States Constitution [12] and article I, section 10 of the Hawai'i Constitution,[13] *Brooks,* 406 U.S. at 607–12, 406 U.S. 605; *Grindles,* 70 Haw. at 532–33, 777 P.2d at 1190–91, and a violation of Kido's right to due process under the fourteenth amendment to the United States Constitution [14] and article I, section 5 of the Hawai'i Constitution.[15] *Brooks,* 406 U.S. at 612–13, 92 S.Ct. 1891. Again, our holding is based on the specific facts of this case. Accordingly, "nothing we say here otherwise curtails in any way the ordinary power of a trial judge to set the order of proof[.]" *Id.* at 613, 92 S.Ct. 1891 (1972). *See also Harris v. Barkley,* 202 F.3d 169, 173 (2d Cir.2000) ("Notwithstanding ... some of the broad language the Court employed in *Brooks,* we conclude that *Brooks* does not constitute a general prohibition against a trial judge's regulation of the order of trial in a way that may affect the timing of a defendant's testimony.").

■ As we have noted, the State concedes the error. But the State does not concede the appeal, for it avers that the error was harmless beyond a reasonable doubt. On the other hand, Kido cites and paraphrases *Grindles,* 70 Haw. at 532, 777 P.2d at 1190, in arguing that "there can be no harmless error where a Court departs 'from the well-established order of proof in a criminal case[.]' " Opening Brief at 15.

In this latter respect, we disagree with Kido. As we have mentioned, the *Brooks*

Court impliedly held that the error there, so similar to the error here, was subject to harmless error analysis. *Brooks,* 406 U.S. at 613, 92 S.Ct. 1891. As we have also observed, the prejudice in *Grindles* went without saying precisely because of the outr'e circumstances of that case. And it cannot be said, as was the case in *Grindles,* that the error here was a derogation of "the well-established order of proof in criminal cases[,]" *Grindles,* 70 Haw. at 532, 777 P.2d at 1190, for the *Brooks* Court made it clear that it was finding error in an order of proof that was theretofore often ordained. *Brooks,* 406 U.S. at 607, 92 S.Ct. 1891. *See also Harris,* 202 F.3d at 173.

■ We do not in any event discern error here of the kind and magnitude our supreme court has intimated can never be deemed harmless. *State v. Holbron,* 80 Hawai'i 27, 32 n. 12, 904 P.2d 912, 917 n. 12 (1995) ("this court has viewed certain rights protected by the Hawai'i Constitution to be so basic to a fair trial that their contravention can never be deemed harmless" (brackets, citation and internal quotation marks omitted)). Accordingly, we apply the harmless beyond a reasonable doubt standard generally applicable to trial error, constitutional or otherwise:

> Error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction. If there is such a reasonable possibility in a criminal case, then the error is

loquy is immediately prior to the close of the defendant's case. Therefore, whenever possible, the trial court should conduct the colloquy at that time.
*Tachibana,* 79 Hawai'i at 237, 900 P.2d at 1304 (footnote omitted).

**12.** The fifth amendment to the United States Constitution provides, in pertinent part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself[.]"

**13.** Article I, section 10 of the Hawai'i Constitution provides, in relevant part, that "[n]o person

shall ... be compelled in any criminal case to be a witness against oneself."

**14.** The fourteenth amendment to the United States Constitution provides, in pertinent part, "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law[.]"

**15.** Article I, section 5 of the Hawai'i Constitution provides, in relevant part, that "[n]o person shall be deprived of life, liberty or property without due process of law[.]"

not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*Id.* at 32, 904 P.2d at 917 (brackets, citation and block quote format omitted).

Applying this standard, we disagree with the State's position that the court's error was harmless beyond a reasonable doubt. Essentially, the trial boiled down to the credibility of the witnesses. Garcia's testimony was comprehensively exculpatory and self-sufficient in that respect. Hearing it first would surely have enlightened Kido's decision whether to testify in his own defense, especially in the light of its otherwise inconsistent and contradictory details—for example, Garcia's testimony that Kido was a current user of crack cocaine, that Garcia did not have a backpack, and that Kimo was present throughout the encounter. Had the court allowed Garcia to testify first, perhaps Kido would then have been well advised to leave well enough alone. The pertinent point is that he would have been afforded the constitutionally-mandated means and opportunity to make the decision, so informed. *Brooks*, 406 U.S. at 608, 612–13, 92 S.Ct. 1891; *Grindles*, 70 Haw. at 532–33, 777 P.2d at 1190–91.

■  Hence, we perceive a reasonable possibility that the court's error contributed to Kido's conviction, and was therefore not harmless beyond a reasonable doubt. Accordingly, Kido's convictions must be set aside. *Holbron*, 80 Hawai'i at 32, 904 P.2d at 917. Upon and beyond this conclusion, we must consider whether there was sufficient evidence adduced at trial to support Kido's convictions. "[C]hallenges to the sufficiency of the evidence must always be decided on appeal. This is because the Double Jeopardy Clause bars retrial of a defendant once a reviewing court has found the evidence at trial to be legally insufficient to support a conviction." *State v. Malufau*, 80 Hawai'i 126, 132, 906 P.2d 612, 618 (1995) (citation and internal quotation marks omitted).[16]

■  On appeal, Kido attacks the sufficiency of the evidence adduced at trial, but only with respect to Count I. His argument in this regard, that the evidence was insufficient to show he knew there was cocaine in the glass pipe, is essentially identical to the one presented in the June 25, 2001 motion for judgment of acquittal he filed with the court, which we attempted to detail above. Suffice it to say that the evidence adduced at trial-taken in the light most favorable to the State, *State v. Ildefonso*, 72 Haw. 573, 576, 827 P.2d 648, 651 (1992), and in light of the prerogative of the jury in the sphere of witness credibility and weight of the evidence, *State v. Tamura*, 63 Haw. 636, 637–38, 633 P.2d 1115, 1117 (1981)—showed that Kido, a user of crack cocaine confronted by the sudden propinquity of the police, concealed, then discarded, and then again attempted to conceal, or to destroy, a glass pipe containing and designed for smoking crack. Contrary to Kido's arguments below and on appeal, this was substantial evidence that he knew there was cocaine in the pipe. *Ildefonso*, 72 Haw. at 577, 827 P.2d at 651.

### III.  Conclusion.

Accordingly, the January 8, 2002 judgment of the court, as amended on January 15, 2002, is vacated and the case is remanded for

---

16.  The test on appeal for a claim of insufficient evidence is "whether, viewing the evidence in the light most favorable to the State, there is substantial evidence to support the conclusion of the trier of fact." *State v. Ildefonso*, 72 Haw. 573, 576, 827 P.2d 648, 651 (1992) (citations omitted). *See also State v. Tamura*, 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981). "Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a man of reasonable caution to reach a conclusion." *Ildefonso*, 72 Haw. at 577, 827 P.2d at 651 (citation, internal quotations marks and ellipsis omitted). "The jury, as the trier of fact, is the sole judge of the credibility of witnesses or the weight of the evidence." *Tamura*, 63 Haw. at 637–38, 633 P.2d at 1117 (citations omitted). "[V]erdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings." *Tsugawa v. Reinartz*, 56 Haw. 67, 71, 527 P.2d 1278, 1282 (1974) (citation and internal quotation marks omitted). "It matters not if a conviction under the evidence as so considered might be deemed to be against the weight of the evidence so long as there is substantial evidence tending to support the requisite findings for the conviction." *Ildefonso*, 72 Haw. at 576–77, 827 P.2d at 651 (citation and internal quotation marks omitted).

a new trial.  *Malufau*, 80 Hawai'i at 132, 906 P.2d at 618.