109 P.3d 708

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**David WISE, Defendant–Appellant.**

**No. 26125.**

Intermediate Court of Appeals of Hawai'i.

March 8, 2005.

Daisy Lynn B. Hartsfield, Deputy Public Defender, State of Hawai'i, on the briefs, for defendant-appellant.

Ryan Yeh, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., LIM and FOLEY, JJ.

Opinion of the Court by LIM, J.

David Wise (Defendant or David) appeals the September 5, 2003 judgment upon a jury's verdict, entered in the Family Court of the First Circuit,[1] that convicted him of violating a temporary restraining order (the TRO).[2] Defendant contends (1) the State failed to present sufficient evidence that he intentionally or knowingly violated the TRO; and (2) the contact he had with the complaining witness, his estranged wife (the CW), was *de minimis*.[3] We disagree with both of Defendant's contentions, and affirm.

## I. Background.

On July 17, 2003, the CW obtained the TRO against Defendant. The TRO ordered Defendant to refrain from contacting the Plaintiff, the CW, as follows:

1. The Honorable Rhonda A. Nishimura presided.

2. Hawaii Revised Statutes (HRS) § 586–4(d) (Supp.2004) provides in pertinent part, "When a temporary restraining order is granted and the respondent or person to be restrained knows of the order, a knowing or intentional violation of the restraining order is a misdemeanor."

3. HRS § 702–236 (1993) provides:
    (1) The court may dismiss a prosecution if, having regard to the nature of the conduct alleged and the nature of the attendant circumstances, it finds that the defendant's conduct:
    (a) Was within a customary license or tolerance, which was not expressly refused by the

1. Do not threaten or physically abuse the Plaintiff or anyone living with the Plaintiff.

2. Do not contact, write, telephone, or otherwise electronically contact (by recorded message, pager, etc.) the Plaintiff, including where the Plaintiff lives or works.

3. Do not visit or remain within 100 yards of any place where the Plaintiff lives or works. **Do not violate this order even if the Plaintiff invites you to be at the place where the Plaintiff lives or works.**

. . . .

4. Do not have contact with: [The Plaintiff.]

(Bolding in the original.) The TRO was to expire on October 15, 2003.

Honolulu Police Department Officer Kevin Lopez (Officer Lopez) testified that he served Defendant with the TRO on the same day it was issued. Officer Lopez explained the service procedures:

Q Okay, and then when you serve that restraining order, is there a procedure you follow when, in the process of serving someone?

A Yes.

Q And what is that procedure?

A Identify the person that needs to be served and explain to them the parameters of the TRO, the judge's orders, no contact. Depends what the order is, if they have to move out. Whatever that order is, I explain that to them and I inform them of

person whose interest was infringed and which is not inconsistent with the purpose of the law defining the offense; or
(b) Did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction; or
(c) Presents such other extenuations that it cannot reasonably be regarded as envisaged by the legislature in forbidding the offense.
(2) The court shall not dismiss a prosecution under subsection (1)(c) of this section without filing a written statement of its reasons.

the court date which is also on the temporary restraining order.

Q So basically, you go through the order with the person that you serve?

A Just the judge's orders parts. I don't read the personal information part.

Q Right——

A I let them—there's a copy of the temporary restraining order and he can go through and read it.

Q So basically, you just go through the parts which state what he can and what he can't do?

A Yes, and the court date that he needs to appear.

Q And do you also give the defendant, the person a copy of that?

A Yes, he gets a copy of the TRO.

Q Did you follow those procedures on July 17th when you served the defendant?

A Yes.

Officer Lopez served the TRO at Defendant's apartment:

Q And you explained to the defendant what he was being served with?

A Yes, a temporary restraining order. I did not, I did not read the order itself as far as what the plaintiff or the person getting the TRO on him said. I went through what he cannot do. I explained to him that, you know, just stay away for a couple of weeks. When you go to court, you talk to the judge, you can explain your side of the story and then at that time, they'll decide if the TRO is granted or not.

Q Did you tell the defendant anything else?

A That's it. It was really quick. I had him sign the temporary, the serving paperwork and then I left.

. . . .

Q Now, you said you recognized the earlier document, the proof of service document, did you—I'm gonna show you the document again, proof of service. Did the defendant sign this document?

A Yeah, he filled in that whole section, the date, the time, where it was served, and he signed his name.

. . . .

Q Did you see him sign that document?

A Yeah. He signed it right in front of me.

. . . .

Q And based on the order that you served on the defendant, the restraining order, did you explain to the defendant that he could have no contact with [the CW]?

A Yes.

The CW and the man she was living with at the time of the offense, an acquaintance of Defendant's, also testified for the State. Their testimonies revealed the following essentials. At about 9:30 a.m. on July 22, 2003, Defendant showed up at the man's door looking for the CW. The CW was inside the apartment and unseen at the time. The man asked Defendant what he was doing there, and Defendant responded, "I thought you would be happy that I've been served my divorce papers." When Defendant asked him whether the CW was there, the man replied, "I'm not gonna say anything about she's here or she's not, but you know, you better leave." Defendant eventually left. The CW testified that Defendant would have known she was in the apartment, because she had told mutual friends she was staying there.

About an hour after Defendant left, the man and the CW left the apartment to visit one of her friends. The man drove his car with the CW in the front passenger seat. When they reached the end of the driveway and prepared to enter the public street, Defendant drove by. Defendant saw them and pulled his vehicle over alongside the driver's side of the man's car. All the while, Defendant was shouting angrily at the man:

You fucking lying, you know, to me, you know, this morning and my wife was with you all along and you lied to me and I thought you my friend. And then when he pulled over, that's when he start shouting at me again, like, you know, how can you put yourself so low to help that bitch.

Defendant then looked directly at the CW, made eye contact with her, and yelled, "I'm gonna get bitch, you know, you ass in Fiji

tonight." Meaning, that Defendant was going to have the CW deported. The man yelled at Defendant to leave, but Defendant backed his car up, pulled over alongside the passenger's side of the man's car, and angrily yelled more of the same at the CW. The CW warned Defendant that he was violating the TRO. She got out her cell phone and threatened to call the police. After shouting a little more, Defendant backed up and drove off. The CW was left scared and shaking. En route to her friend's house, the CW called her attorney and then, on her attorney's advice, called the police.

Under cross-examination, the man acknowledged that he had a computer the CW had brought with her when she moved into his apartment. Both the CW and the man admitted to defense counsel that they had since become "romantically involved" with each other.

Defendant chose not to testify and offered no evidence of his own. However, defense counsel suggested in his closing argument that Defendant went to the apartment for the computer, not knowing the CW was there. Similarly, defense counsel contended Defendant had no reason to know the CW was in the man's car as he drove past them later on the public street. Defense counsel also insinuated that the CW and her man had lied about the prohibited contact, because they wanted Defendant—who was still married to the CW—out of the picture.

## II. Discussion.

### A. Sufficiency of the Evidence.

■ Defendant contends there was insufficient evidence[4] that he intentionally or knowingly violated the TRO. Defendant supports his contention with two primary arguments.

First, Defendant claims there was insufficient evidence that he knew what the TRO prohibited. *See* Hawaii Revised Statutes (HRS) § 586–4(d) (Supp.2004). Defendant explains:

> Based on the testimony of Ofc. Lopez *there is nothing in the record that indicates David understood the nature of the TRO or its prohibited conduct.* Ofc. Lopez testified that he did not read the TRO itself to David. Ofc. Lopez's explanation to David was misleading and inaccurate. He told David that the TRO was effective for only a couple of weeks and instead of saying "no contact" he explained to David to "stay away." The TRO does not provide a definition of what "have no contact" means. "Have no contact" is an ambiguous term and whether or not David understood its meaning is questionable. Finally, although David signed the paperwork it does not mean he was aware of all the TRO restrictions; it just indicates receipt of the TRO.

Opening Brief at 11 (emphasis in the original). This argument lacks merit, for it takes the evidence in the light most favorable to Defendant. Viewed in the light proper on appeal—which is, "most favorable to the State," *State v. Kido*, 102 Hawai'i 369, 379 n. 16, 76 P.3d 612, 622 n. 16 (App.2003) (citations and internal quotation marks omitted)—there was substantial evidence that Defendant knew what the TRO forbade. *Id.*

■ Second, Defendant avers there was insufficient evidence that he intentionally or

---

4. The test on appeal for a claim of insufficient evidence is "whether, viewing the evidence in the light most favorable to the State, there is substantial evidence to support the conclusion of the trier of fact." *State v. Ildefonso*, 72 Haw. 573, 576, 827 P.2d 648, 651 (1992) (citations omitted). *See also State v. Tamura*, 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981). "Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a man of reasonable caution to reach a conclusion." *Ildefonso*, 72 Haw. at 577, 827 P.2d at 651 (citation, internal quotations marks and ellipsis omitted). "The jury, as the trier of fact, is the sole judge of the credibility of witnesses or the weight of the evidence." *Tamura*, 63 Haw. at 637–38, 633 P.2d at 1117 (citations omitted). "[V]erdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings." *Tsugawa v. Reinartz*, 56 Haw. 67, 71, 527 P.2d 1278, 1282 (1974) (citation and internal quotation marks omitted). "It matters not if a conviction under the evidence as so considered might be deemed to be against the weight of the evidence so long as there is substantial evidence tending to support the requisite findings for the conviction." *Ildefonso*, 72 Haw. at 576–77, 827 P.2d at 651 (citation and internal quotation marks omitted).

*State v. Kido*, 102 Hawai'i 369, 379 n. 16, 76 P.3d 612, 622 n. 16 (App.2003).

knowingly violated the TRO. HRS § 586–4(d). Defendant makes a number of arguments in this regard. Defendant maintains that he did not know the CW was staying at the man's apartment and thus, he did not intentionally or knowingly "visit or remain within 100 yards of any place where the Plaintiff lives or works." Defendant emphasizes that he did not "threaten or physically abuse the Plaintiff or anyone living with the Plaintiff." Hence, he argues, his conduct, while expressive of anger and frustration, was not a violation of the TRO. Defendant also points out that he did not "contact, write, telephone, or otherwise electronically contact (by recorded message, pager, etc.) the Plaintiff, including where the Plaintiff lives or works." Finally, Defendant points out that he drove away from the scene as soon as the CW reminded him about the TRO.

None of these arguments hold water. Even assuming that Defendant did not violate other prohibitions of the TRO, there was nonetheless substantial evidence that he intentionally or knowingly contacted the CW in the car. *Kido,* 102 Hawai'i at 379 n. 16, 76 P.3d at 622 n. 16. And the mere fact that he discontinued the violation at some point does not derogate the substantiality of that evidence.

### B. De Minimis *Infraction.*

■ For his other point of error on appeal, Defendant maintains that, even if he did contact the CW, the contact was *de minimis* under HRS § 702–236 (1993), and the family court should therefore have dismissed the charge *sua sponte.* Citing HRS § 586–4(c) (Supp.2004) ("The order further shall state that the temporary restraining order is necessary for the purposes of: preventing acts of abuse or preventing a recurrence of actual domestic abuse; and ensuring a period of separation of the parties involved."), Defendant contends:

> the evidence indicates that the conduct engaged in, if any, was minor and did not actually cause or threaten the harm or evil

HRS § 586–4 seeks to prevent. There was no evidence of violence or abuse, or threats of violence or abuse, by David against [the CW]. This is the type of conduct that HRS § 586–4 was enacted to protect against.

Opening Brief at 6 (citation and citation to the record omitted). Defendant adds that the contact was brief and that he drove off soon after he was reminded of the TRO.

Even assuming that we may notice plain error in this regard, Defendant's point is unavailing. While we agree that the purpose of an HRS § 586–4 TRO is to prevent domestic abuse, HRS § 586–4(c), the plain and obvious purpose of the HRS § 586–4(d) misdemeanor is to prevent violations of the TRO. Therefore, "having regard to the nature of the conduct alleged and the nature of the attendant circumstances," HRS § 702–236(1), it cannot be said that Defendant's conduct did not "actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction[.]" HRS § 702–236(1)(b). Nor can it be said that Defendant's conduct was "within a customary license or tolerance, which was not expressly refused by the person whose interest was infringed and which is not inconsistent with the purpose of the law defining the offense[,]" HRS § 702–236(1)(a), or that Defendant's conduct presented "such other extenuations that it cannot reasonably be regarded as envisaged by the legislature in forbidding the offense." HRS § 702–236(1)(c).

### III. Conclusion.

Accordingly, the September 5, 2003 judgment of the family court is affirmed.