31 A.3d 603

Erik STODDARD

v.

STATE of Maryland.

No. 105, Sept. Term, 2010.

Court of Appeals of Maryland.

Nov. 3, 2011.

Reconsideration Denied Nov. 18, 2011.

422

Michael R. Braudes, Asst. Public Defender (Paul B. De-Wolfe, Public Defender, Baltimore, MD), on brief, for petitioner.

Sarah Page Pritzlaff, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE and JOHN C. ELDRIDGE (Retired, specially assigned), LAWRENCE F. RODOWSKY, (Retired, specially assigned), IRMA S. RAKER (Retired, specially assigned), JJ.

RAKER, J.

Erik Stoddard, petitioner, was convicted by a jury in the Circuit Court for Baltimore City of child abuse resulting in the death of a child and manslaughter. In this appeal, he presents two questions to this Court, which we rephrase as follows:

1. Did the trial court err in requiring the petitioner either to testify prior to the completion of the defense case or to forfeit the right to testify?

2. Did the trial court err in admitting evidence of prior bad acts and a question implying that petitioner posed a threat to another child?

We shall hold that the trial court erred by placing an impermissible restriction on petitioner's right against self-incrimination and infringing his right to due process when it required him to testify prior to the completion of the defense case or to forgo testifying at all. We shall nevertheless hold that this error was harmless under the circumstances of this case. We shall further hold that the trial court did not err in admitting the evidence in question. For the reasons stated herein, we shall affirm.

## I.

This case arises out of the death of three-year-old Calen DiRubbo on June 15, 2002. In connection with this death, petitioner has been tried three times by the Circuit Court for

Baltimore City for the charges of murder and child abuse resulting in death. The jury in petitioner's first trial convicted him of second degree murder and child abuse resulting in death, but this Court reversed the conviction. *See Stoddard v. State,* 389 Md. 681, 887 A.2d 564 (2005). The jury in petitioner's second trial convicted him of second degree murder and child abuse resulting in death, but the trial court granted petitioner's motion for a new trial because the court determined that it had failed to ask a mandatory voir dire question. The jury in petitioner's third trial convicted him of child abuse resulting in death and manslaughter, and the trial court sentenced him to a term of incarceration of consecutive sentences of thirty years and ten years. Petitioner appealed to the Court of Special Appeals, which affirmed in an unreported opinion. *See Stoddard v. State,* No. 1185, Sept. Term 2008 (filed August 24, 2010). We granted Stoddard's Petition for a Writ of Certiorari. *Stoddard v. State,* 417 Md. 125, 9 A.3d 1 (2010).

At the time of Calen DiRubbo's death, petitioner was the boyfriend of Calen's mother, Cheryl DiRubbo, and had lived with them for several months. On the day that Calen died, petitioner was the only adult watching her for much of the morning and parts of the afternoon. Several other friends and relatives were present at the DiRubbo home and with Calen at various points during that day. Most notably, Nick Dieter, who was Cheryl DiRubbo's estranged husband, the father of Calen's half-brother, and the de facto stepfather of Calen, was watching her in the late afternoon and evening while petitioner and Cheryl went out on a date. At approximately 10:30 p.m., Dieter went to let two friends in the front door of the house, walked by the couch where he thought Calen was sleeping, and realized that she was dead. One of the friends immediately called 911, and following the instructions of the 911 operator Dieter attempted to perform CPR on Calen. After the paramedics arrived, Dieter called Cheryl and petitioner to let them know what was happening, and Cheryl returned to the house.

The police arrested Dieter initially in connection with Calen's death, as he was the only adult with her when she died, and they assumed that her fatal injuries were inflicted immediately prior to her death. The medical examiner, however, estimated later that the fatal injury was likely inflicted several hours prior to Calen's death, during a period of time that corresponded to when she was under the care of petitioner. The medical examiner found that Calen's cause of death was blunt force injuries, that she had bruises and scrapes on her body, and that she appeared to have been suffering from abuse for some time. The medical examiner noted that the fatal injury was a blow to the abdomen, resulting in two large tears to the bowel and internal bleeding.

Shortly after Calen's death and under intense questioning, Cheryl DiRubbo gave a statement to the police that implicated petitioner. She indicated, among other things, that petitioner had physically abused her, that petitioner had physically abused Calen, and that she had spoken with petitioner on the phone around noon on the day of Calen's death, while Calen was still in his exclusive care, and that he had told her then that Calen had just vomited. At trial, Cheryl DiRubbo recanted this statement, testifying that she had lied to the police, claiming that the police had pressured her into implicating petitioner, that she had been merely telling police what they wanted to hear, and that she did so out of fear of losing custody of her other child and out of a fear of Nick Dieter.

The police officer who conducted the interview testified, among other things, that they did not pressure her to implicate anyone and that they were surprised when Cheryl DiRubbo implicated petitioner in her statement, because at the time of questioning they had Nick Dieter in custody for the killing and were expecting her to inculpate him.

Charles Phren, the husband of Cheryl DiRubbo's mother and godfather to Calen, testified that he and Cheryl's mother spoke to her immediately prior to her statement to the police, and that he told her that although she had failed to protect Calen in life, the least she could do for her in death was to tell

the police the truth. In response, Cheryl put her head down, began to cry, and made the statement implicating petitioner that she subsequently recanted at trial. Dieter testified, *inter alia,* that he had a very close and loving relationship with Calen, whom he regarded as his daughter. He stated that, although his marriage to Cheryl DiRubbo was over and he had moved out several months before Calen's death, he still paid child support and regularly cared for both Calen and his son. He explained that he had been unable to watch Calen on the day she died because he spent most of the day retrieving his car from an impound lot, having been arrested for driving under the influence of alcohol the previous night. When he was able to begin looking after Calen in the late afternoon, he said that she appeared to be sick and in pain. He stated that she had vomited, that he rinsed her off in the bathtub, and that he put her down on the couch to rest.

Both Cheryl DiRubbo's mother and sister testified that Dieter was very loving towards Calen, and that Calen had been a happy child for most of her life. They also stated that in the months leading up to Calen's death, when Dieter had moved out and petitioner lived in the house as Cheryl's boyfriend, they noticed that bruises started appearing on Calen's body, that she started to seem more withdrawn, and that, while she remained affectionate towards Dieter, Calen appeared to be afraid of petitioner.

Mark DiRubbo, Cheryl's father and Calen's grandfather, was deceased at the time of petitioner's third trial, but his testimony from a previous proceeding was read to the jury. His testimony explained that Dieter treated Calen like a daughter, and that Calen seemed fine and was playing when he left her in petitioner's care at 11:45 a.m. on the day of her death.

The friends who helped Dieter pick up his car from the impound lot, and who were being let into the house when Dieter discovered that Calen was dead, also testified. Their testimony largely confirmed Dieter's version of the events from that day, including the timing of his arrival at the house,

that Calen was sick when he arrived, and that he appeared to be stunned and devastated when he discovered that Calen was dead.

Several witnesses testified for the defense. An employee of the impound lot and a private investigator testified as to the time of the lot's closing and the amount of time it takes to drive to certain locations, in an attempt to raise doubts as to when Dieter arrived at the house. The paramedics that responded to the 911 call regarding Calen testified that Dieter's demeanor was strange and unemotional and that his behavior was uncooperative. The friend whose party petitioner and Cheryl DiRubbo were attending when they received Dieter's call about Calen testified that petitioner became upset when he heard the news.

Petitioner testified that he had never hit either Calen or Cheryl, but that he had seen both Cheryl and Dieter spank and hit Calen. He testified that Calen was not sick and did not vomit while she was in his care on the day of her death. Further, he stated that Dieter arrived at the house and took over watching the children much earlier in the day than Dieter claimed, and that Dieter was highly agitated when he arrived.

The final witness for the defense was a medical expert named Dr. Isidore Mihalakis. He testified that, based on his examination of the medical examiner's report and slides, he believed that Calen could have survived up to twenty-four hours after receiving the internal injuries that killed her. He also testified that at the time Dieter claimed to have rinsed vomit off of Calen in the bathtub, her injuries would have made it very painful for her to move and that the bruises would likely have been visible. He acknowledged that he had investigated very few child homicides in his career as a medical examiner in Warren County, New Jersey.

Scheduling became complicated during trial because the trial court had committed to attend a judicial meeting out of state and because of the unavailability of the defense's medical expert to testify before the trial break. Prior to trial, the parties anticipated that the case would be completed before

Wednesday, April 23, 2008, which was the first day of a three-day judicial conference that the trial judge was scheduled to attend. When on the afternoon of Tuesday April 22 it became clear that the trial would run longer than expected, the judge said she planned to adjourn proceedings until Monday, April 28. In an attempt to convince the court that the defense could finish presenting its case on Wednesday morning, counsel stated:

"[DEFENSE COUNSEL]: Your Honor, first of all, I, just as far as mere scheduling, I have two more brief witnesses at this point in time. I also, after those two very brief witnesses . . ., I potentially have a longer witness who could take anywhere between two and two and a half hours. If we go late today, past six o'clock, then I believe we should conclude with everybody except for Dr. Mihalakis."

When the trial judge reminded the parties that she could not hold court on Wednesday April 23, defense counsel informed the court that the medical expert would not be available on Monday April 28 *or* Tuesday April 29.

Defense counsel continued to press the court to permit Dr. Mihalakis to testify the next morning and asserted that "if we worked past six o'clock" Tuesday evening, all of the other defense witnesses could testify.

"[DEFENSE COUNSEL]: I have a total of four more witnesses to call. One witness, Dr. Mihalakis, who is available tomorrow morning and the following Wednesday[,] will take about an hour. Two of my witnesses will be very short, but one of my witness, I believe based on prior testimony, would take probably a good, maybe as much as two and a half hours."

The State suggested that they could "knock out the long witness" that evening, and hear testimony by the expert and the two brief witnesses the next day. But when the court was adamant that it could not sit on Wednesday, defense counsel requested that the trial be continued until Wednesday April 30. The State objected and argued that testimony should resume on Monday April 28. Over the State's objection, the

circuit court agreed to hear the defense's remaining witnesses that evening and adjourn until Wednesday April 30 when Dr. Mihalakis would testify.

The defense's two "brief" witnesses testified that evening but took a bit longer than expected. Petitioner and both counsel approached the bench and the following colloquy ensued:

"[DEFENSE COUNSEL]: Your Honor, at this point in time, I don't have any more civilian witnesses to call. The one witness who I would call will probably take about two and a half hours and I would prefer to call him on Wednesday and I do not want a break in the testimony.

THE COURT: All right. Is he here?

[DEFENSE COUNSEL]: He's right, standing right there, Your Honor.

THE COURT: All right.

[PROSECUTOR]: It's the Defendant.

THE COURT: Call him."

Defense counsel and petitioner conferred, and the court instructed counsel to advise petitioner on the record regarding his right not to testify, which defense counsel did. Petitioner stated that he understood. Then, defense counsel addressed the court and said:

"[DEFENSE COUNSEL]: —I discussed this matter with my client and he says, he's told me that at this point in time, it's his election not to testify. However, he would reserve the right to take the witness stand before the close of the defense case.

THE COURT: There's no reservation. He will testify now or he will not testify.

[DEFENSE COUNSEL]: Your Honor, he, he's, at this point in time, he's not, he's not electing to testify. However, he reserves the right to testify before the close of the defense case. So he's not—

THE COURT: He will not testify unless he takes the, if he wishes to testify, he may testify now. He does not get to

choose to testify on Wednesday. So if he wishes to testify, he needs to testify now, [defense counsel].

[PETITIONER]: And, Your Honor, may I be heard, please?

THE COURT: No.

[DEFENSE COUNSEL]: Your Honor, just—well, most respectfully, just for the record, Your Honor, the defense would object to being placed in the position where my client has to testify before all the defense witnesses have actually taken the witness stand.

[PETITIONER]: It violates my rights.

THE COURT: [Defense counsel], you are being disingenuous. You have indicated continuously that Dr. Mihalakis would be your last witness and that this witness will testify this afternoon and it'll be a long witness and about two and a half hours. You have now decided that you don't want to call him until next Wednesday. I'm telling you, if he's going to testify, he's going to testify this afternoon and you need to call him now. You know and I know that the law doesn't permit him to make choices about timing. So you either call him now or you don't call him.

[DEFENSE COUNSEL]: Yes, Your Honor. Well, I, again, I've discussed the matter with my client and he—

[PETITIONER]: (Inaudible). I adamantly object to it. I think it's (inaudible) my case. It's totally against what I think is my right. I have a right to evaluate all the evidence presented in my case and then make my determination based on that and I'm bein' refused this right. I want that specifically clear in the record 'cause that's what I believe.

[DEFENSE COUNSEL]: Your Honor, most respectfully, my client would like me to convey to the Court that if, if his choice is to either testify now or not testify at all, he will testify now. However, he says that he is doing so over objection because he would like to reserve his, you know, that particular right until we reach the point where we're at

the close of the defense case. So I'm just makin' the record, Your Honor.

THE COURT: Fine. Call your witness."

Defense counsel called petitioner as a witness, and at the close of direct examination, the court instructed the jury to return the following week. Upon returning on Wednesday April 30, the jury heard the State's cross-examination and defense counsel's redirect examination of petitioner, as well the testimony of the defense's medical expert.

The jury convicted petitioner, the circuit court imposed sentence, and petitioner's appeals to the Court of Special Appeals and to this Court followed.

## II.

Before this Court, petitioner argues that the trial court's requiring him to testify, if he wished to testify at all, prior to the last defense witness violated due process and the prohibition of compelled self-incrimination guaranteed by the United States Constitution, as set forth in *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972), the Maryland constitution, and Maryland common law.

Petitioner's second issue is that the trial court erred when it allowed the State to elicit testimony from Nick Dieter that the petitioner had assaulted him in the past, allowed the State to play a recording of Cheryl DiRubbo's statement that petitioner had assaulted her in the past, and allowed the State to ask Cheryl DiRubbo a question that allegedly implied that petitioner would pose a danger to her son if allowed to go free. Petitioner argues that these were each instances of inadmissible "other crimes" evidence or outright character assassination, and that they were highly prejudicial.

The State argues that *Brooks* merely struck down a statute requiring every defendant to testify first, if at all, and that neither it nor its progeny guarantees a defendant an unqualified constitutional right to testify last. The State further argues that petitioner had decided to testify, (and even to

testify in the second-to-last position), that he knew exactly what the final witness was going to say (as the witness had testified at his previous trial), and petitioner's objection to testifying before the final witness was a disingenuous argument that merely attempted to delay his testimony so that it would not be divided over two days. Finally, the State argues that even assuming *arguendo* that there was a *Brooks* error, it was harmless because petitioner had every intention to testify anyway and there was no reasonable possibility that the alleged error contributed to the guilty verdict.

As to the evidentiary rulings, the State argues that each of those rulings involved a different factual and legal foundation, and that the trial court exercised its discretion properly in each instance. The testimony regarding the assaults on Nick Dieter was admissible to rehabilitate the witness after the defense had impeached him with a prior omission. The recording of Cheryl DiRubbo stating that petitioner had assaulted her was admissible to show a motive for giving testimony that is false and inconsistent with prior statements. Likewise, the question regarding Cheryl DiRubbo's son did not prejudicially imply that petitioner would harm him, but rather it was permissible as it flowed directly from the witness's prior inconsistent statement and went to her motive for testifying falsely.

### III.

We first address whether the trial court's demand that petitioner decide whether he would testify prior to the defense expert or not at all was error.

In *Brooks v. Tennessee*, 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972), the United States Supreme Court struck down a Tennessee statute that required a defendant wishing to testify in his own behalf to be the first witness called by the defense. The Court held that this requirement, even though predicated on the legitimate state interest in preventing testimonial influence, violated a defendant's right to effective assistance of counsel and to due process because it limited coun-

sel's ability to evaluate the need for such testimony. The Supreme Court explained the implication of this constitutional interest, noting as follows:

> "Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right. By requiring the accused and his lawyer to make that choice without an opportunity to evaluate the actual worth of their evidence, the statute restricts the defense—particularly counsel—in the planning of its case. Furthermore, the penalty for not testifying first is to keep the defendant off the stand entirely, even though as a matter of professional judgment his lawyer might want to call him later in the trial. The accused is thereby deprived of the 'guiding hand of counsel' in the timing of this critical element of his defense. While nothing we say here otherwise curtails in any way the ordinary power of a trial judge to set the order of proof, the accused and his counsel may not be restricted in deciding whether, and when in the course of presenting his defense, the accused should take the stand."

*Id.* at 612–13, 92 S.Ct. at 1895, 32 L.Ed.2d at 364. The *Brooks* Court held also that such a practice violated the defendant's right to remain silent because, although the statute was meant to ensure truthful testimony, "[p]ressuring the defendant to take the stand, by foreclosing later testimony if he refuses, is not a constitutionally permissible means of ensuring his honesty." *Id.* at 611, 92 S.Ct. at 1895, 32 L.Ed.2d at 363.

In the decades since the *Brooks* Court's ruling, some courts have attempted to limit the protection afforded to defendants in the decision's broad language by focusing on the specific facts of the cases before them, differentiating those circumstances from the circumstances in *Brooks,* and emphasizing the trial court's necessary discretion in scheduling cases. *See, e.g., Harris v. Barkley,* 202 F.3d 169, 174 (2d Cir.2000) (finding no *Brooks* violation when defendant was forced to testify before a witness that was not yet available); *United States v. Leon,* 679 F.2d 534, 538 (5th Cir.1982) (same); *People v. Walden,* 224 P.3d 369, 376–78 (Colo.Ct.App.2009) (same); *State v. Turner,* 252 Conn. 714, 751 A.2d 372, 384 (2000)

(same). Other courts, however, have interpreted the language in *Brooks* to provide a wide scope of the protection and analyzed the circumstances before them to determine, first, if a *Brooks* violation had occurred and, second, whether that violation was prejudicial or harmless error. *See, e.g., United States v. Rantz,* 862 F.2d 808, 812 (10th Cir.1988) (finding a *Brooks* violation where a defendant was forced to testify at the start of his case in chief, but holding the error harmless); *United States v. Luce,* 713 F.2d 1236, 1241 n. 4 (6th Cir.1983) (citing *Brooks* for the proposition that a defendant "may not constitutionally be forced to decide whether he will testify at any point before the close of his defense"), *aff'd,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984); *United States v. Panza,* 612 F.2d 432, 439 (9th Cir.1980) (finding no violation of the *Brooks* guarantee of "counsel's freedom to decide when a defendant will take the stand"); *State v. Kido,* 102 Hawai'i 369, 76 P.3d 612, 619 (Haw.Ct.App.2003) (same as *Rantz* ). In our view, the former approach tends to conflate unnecessarily the existence of circumstances that make a *Brooks* violation harmless with the lack of a *Brooks* violation. We therefore find the latter approach to be a more reasonable and faithful interpretation and application of the Supreme Court's holding in *Brooks,* and adopt it.

██ When petitioner's counsel requested that the trial adjourn early to avoid interrupting petitioner's testimony by the break in the trial, it was wholly within the trial court's discretion to deny this request. However, once petitioner declared that he had not yet made a final decision whether to testify and wanted to see the final defense witness prior to making this decision, the situation changed. The trial court's refusal to accommodate the request for a delay based upon the rationale given by the court violated *Brooks.*[1] The language

---

1. Some courts have held that a defendant may be required to testify before other defense witnesses when evidentiary rules so require. For instance, "[w]here the trial court reasonably believed that the defendant planned to testify and that his testimony was necessary to lay the foundation for another witness's testimony, a ruling that the defendant must testify before the other witness does not constitute *Brooks* error."

in *Brooks* giving the defendant and defense counsel the prerogative to choose "when in the course of presenting [the] defense" the defendant will testify could hardly be clearer. Although the trial court does have broad discretion in scheduling trials and the order of proof, and preventing delay is an important goal, this discretion and goal must bow to constitutional limitations.[2] The reasoning of the Supreme Court regarding the goal of ensuring honesty applies equally well to the goals of expediency, judicial economy, or preventing delay; they are extremely important goals, but "[p]ressuring the defendant to take the stand, by foreclosing later testimony if he refuses, is not a constitutionally permissible means of" achieving them. *See id.* at 611, 92 S.Ct. at 1895, 32 L.Ed.2d at 363.

The State attempts to draw certain factual distinctions between the instant case and *Brooks*, but none of them convinces us that the legal principles discussed above do not apply. Just because the *Brooks* Court struck down a statewide, across-the-board statutory requirement that a defendant testify at a certain time, we see nothing in the Court's reasoning to suggest that the case-specific, discretionary decision of a single judge to the same effect cannot place an equally "heavy burden on a defendant's otherwise unconditional right not to take the stand." 406 U.S. at 610–11, 92 S.Ct. at 1894, 32 L.Ed.2d at 363. Likewise, although the statute in *Brooks* required the defendant to testify first, the trial court's

---

*Johnson v. Minor*, 594 F.3d 608, 613 (8th Cir.2010); *see also Menendez v. Terhune*, 422 F.3d 1012, 1031–32 (9th Cir.2005). Because the present case does not raise this issue, we express no opinion on whether in such a situation a *Brooks* violation would result.

**2.** The State quotes the *Brooks* decision as wholly affirming the trial judge's broad discretion when it says "nothing we say here otherwise curtails in any way the ordinary power of a trial judge to set the order of proof," without acknowledging that "otherwise" is the operative word in that clause because while the power is not "otherwise" curtailed, it is very much curtailed in the one specific way that is discussed in the unquoted remainder of the quoted sentence, namely, that "the accused and his counsel may not be restricted in deciding whether, and when in the course of presenting his defense, the accused should take the stand." 406 U.S. at 613, 92 S.Ct. at 1895, 32 L.Ed.2d at 364.

action in the instant case was nonetheless error, even though it required petitioner to testify as the second-to-last witness. The reasoning remains the same, whether there is only one witness or many witnesses yet to testify. The State's argument that petitioner was likely going to testify anyway speaks not to whether there was a *Brooks* violation but rather to whether the error, if there be error, was harmless.

Finally, we address the State's argument that petitioner's request to testify last was disingenuous and was not sought to make a fully informed decision as to whether to testify but to obtain a tactical advantage. As to how the decision to testify relates to trial strategy, we harken back to the Supreme Court's recognition that the two are not mutually exclusive: "Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right." *Brooks*, 406 U.S. at 612, 92 S.Ct. at 1895, 32 L.Ed.2d at 364. Petitioner's motive does not eliminate a constitutional error.

## IV.

Violations of *Brooks* are subject to harmless error analysis.[3] The Supreme Court in *Brooks* suggested that the

---

3. Errors that are "trial errors," as opposed to "structural errors," are ordinarily subject to harmless error analysis. *See Arizona v. Fulminante*, 499 U.S. 279, 307–09, 111 S.Ct. 1246, 1264–65, 113 L.Ed.2d 302, 330–31 (1991) (distinguishing between mere trial error that is susceptible to harmless error assessment, and errors that amounted to structural defects in the trial itself). A trial error is an error "which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless." *Id.* at 307–08, 111 S.Ct. at 1264, 113 L.Ed.2d at 330. A structural error is an error that affects "the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at 310, 111 S.Ct. at 1265, 113 L.Ed.2d at 331. Such errors taint the entire trial process itself, affecting the conduct of the trial from the beginning. Moreover, *Brooks* suggests that the error it addressed is subject to harmless error analysis by noting that the State "ma[de] no claim that this was harmless error," 406 U.S. at 613, 92 S.Ct. at 1895, 32 L.Ed.2d at 364, and other courts have applied harmless error analysis to *Brooks* violations, *see, e.g., Rantz*, 862 F.2d at 812. The error before us is not a structural error.

error is subject to harmless error analysis by noting that the State "ma[de] no claim that this was harmless error," 406 U.S. at 613, 92 S.Ct. at 1895, 32 L.Ed.2d at 364, and other courts have applied harmless error analysis to *Brooks* violations. *See, e.g., Rantz,* 862 F.2d at 812. The error before us is trial error, not structural error, and is subject to harmless error analysis.

In order to find an error harmless in a criminal case, we conduct an independent review of the record and must be able to declare beyond a reasonable doubt that the error did not influence the verdict. *See Morris v. State,* 418 Md. 194, 221–22, 13 A.3d 1206, 1222 (2011); *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976). We have reviewed the record of petitioner's trial, and conclude that the error is harmless.

Although it was error for the trial court to require petitioner to make his election to testify prior to the end of the defense case, there is nothing in the record to suggest that anything in the final witness's testimony would have altered petitioner's decision to testify or that the content of petitioner's testimony would have been different. The final witness's testimony appeared consistent with his testimony in petitioner's previous trial. Had petitioner been allowed to hear the final witness's largely identical testimony a second time prior to making his election, there is no reason to believe that he would have made a different decision than the one he made after having heard it twice before.

Our analysis is similar to other courts that have evaluated *Brooks* violations for harmlessness. For example, in *People v. Cuccia,* 97 Cal.App.4th 785, 118 Cal.Rptr.2d 668 (2002), a case with facts similar to the case at bar, the trial court did not want the jury inconvenienced by an absent defense witness and required the defendant to decide whether he wished to testify even though some of his witnesses had yet to appear. The defendant testified. The California Court of Appeal, however, was unpersuaded by the defendant's claim that if he had been permitted to hear all of the evidence before deciding

to testify, he may opted not to do so. The court found that the defendant would have testified in any event because "his testimony was necessary to defend against some elements of the charges against him." *Id.* at 673; *accord Cruz–Padillo v. State*, 262 Ga. 629, 422 S.E.2d 849, 851 (1992) (finding harmless error "because it was necessary for Cruz–Padillo to testify to present [his] defense theories, and . . . discern[ing] no harm from Cruz–Padillo testifying first"). Similarly, Hawaii courts examine the specific facts and circumstances presented by each case to determine whether a *Brooks* violation was harmless beyond a reasonable doubt. *Compare State v. Sale*, 110 Hawai'i 386, 133 P.3d 815, 826 (Haw.Ct.App.2006) (finding "[u]nder these circumstances" that the violation was harmless), *with State v. Kido*, 102 Hawai'i 369, 76 P.3d 612, 621 (Haw.Ct.App.2003) (stating that "based on the specific facts of this case" the violation was not harmless because Kido had not indicated earlier that he would testify and he in no way caused the delay). *See also State v. Amos*, 262 N.W.2d 435, 437 (Minn.1978) (finding no prejudice where "the record will not support a determination that defendant was in any way adversely affected by [the trial court's conditions on when defendant could testify]"). We note that one of the key factors courts consider when analyzing a *Brooks* violation for harmlessness is whether a defendant has already indicated an intention to testify. *See Turner*, 751 A.2d at 384; *Sale*, 133 P.3d at 826; *Amos*, 262 N.W.2d at 437.

To the extent that petitioner is asserting that he would not have decided whether to testify until after he had heard the testimony of the expert witness, we find this assertion dubious. First, as a general matter, "an accused's decision whether to testify seldom turns on the resolution of one factor." *Luce v. United States*, 469 U.S. 38, 42, 105 S.Ct. 460, 463, 83 L.Ed.2d 443, 448 (1984) (internal quotation marks and citation omitted). Second, our review of the record convinces us that petitioner would have elected to testify regardless of the *Brooks* violation. The defense's theory of the case, argued in both its opening and closing statements, was that either Cheryl DiRubbo or Nick Dieter could have inflicted the fatal

injuries on Calen. Evidence supporting this theory came almost exclusively from petitioner's testimony. Further, as discussed below, defense counsel told the trial court that his client was going to testify.

In addition, we do not see anything in the testimony of petitioner's expert witness that might have persuaded him not to testify, had the trial court allowed petitioner to make his election at the end of the defense's case. As noted above, we cannot ignore the particular circumstances and procedural history of this case. Petitioner had undergone two trials before the case on review. He had the same counsel in his previous trial. He elicited the testimony of the same expert witness in his previous trial. Petitioner has not alleged that the expert's testimony departed in any appreciable respect from his previous testimony. Nor has petitioner asserted that he would have altered his testimony or forgone testifying based upon the substance of the expert witness's testimony.

Finally, the trial transcript demonstrates petitioner's intention to testify before the trial court instructed him to testify prior to the break in the proceedings or not at all. Defense counsel, in an attempt to schedule the medical expert as the final witness, informed the court repeatedly on April 22 that he would be calling two brief witnesses and a "longer witness," who, "based on prior testimony, would take ... as much as two and a half hours." When the testimony of the two brief witnesses took longer than expected, defense counsel asked to postpone the testimony of his "longer witness" until Wednesday, April 30. When the circuit court asked if this witness was present, counsel replied that it was petitioner. Whereupon, the court ordered petitioner to take the stand or refrain from testifying. At this point, counsel "object[ed] to being placed in the position where [petitioner had] to testify before all the defense witnesses [had] actually taken the witness stand"; petitioner voiced the same objection as well. But although these objections are well-taken, they do not alter the fact that petitioner had *already* indicated his intention to testify. Whether this election was clear to the court prior to

the colloquy quoted above is irrelevant to our harmless-error inquiry.

As for petitioner's right to the effective assistance of counsel, he makes no argument other than the bald assertion that, owing to the trial court's order to testify on Tuesday, April 22, eight days elapsed between his direct testimony, and his cross-examination, during which time he was unable to consult with counsel. We find no merit in this argument, especially absent any explanation of how such a gap prejudiced petitioner. Moreover, we do not see how it is germane to the question of what prejudice resulted from the *Brooks* violation. The same situation could have arisen even if the trial court permitted petitioner to testify last. The management of trials, including the scheduling of witnesses, resides in the sound discretion of the circuit court, and petitioner has not developed an argument that this discretion was abused or that the division of his testimony was prejudicial.

We are persuaded beyond a reasonable doubt that the trial court's erroneous order denying petitioner the right to testify last neither compelled petitioner to testify nor undermined the efficacy of his testimony. We hold that petitioner was not prejudiced by the trial court's error, and the error, therefore, was harmless.

## V.

Having determined that the trial court's insistence that petitioner testify before his final witness, though error, was harmless, we must also address the admissibility questions raised by petitioner.

### A. Evidence of Assaults Upon Nick Dieter Was Admissible

On direct examination, Nick Dieter testified that, on the morning prior to Calen's death, he called petitioner and that petitioner was angry. On cross-examination, Nick was asked about the statements he gave to the police in the days after Calen's death, and he acknowledged that he had not

mentioned anything about petitioner's anger at the phone call in those statements. On redirect, the State asked why he did not mention the angry phone call to the police, and over multiple objections, Dieter explained that he was "scared of what [petitioner] might do if he found out that I was tellin' the police stuff about him" and that this fear was based on petitioner's having "assaulted me on several occasions prior and even though I never really filled out a police report or anything like that, I knew that if I gave him a good reason to, he wouldn't be afraid to hit me."

Petitioner's objections to this testimony, and his argument that these objections should not have been overruled, are based on a theory that it constitutes inadmissible "other crimes" evidence under Maryland Rule 5–404(b)[4] and the trial court did not undertake the analysis necessary to admit such evidence under *State v. Faulkner,* 314 Md. 630, 634–35, 552 A.2d 896, 898 (1989) (requiring, among other things, a finding that the accused's involvement in the other crimes be established by clear and convincing evidence). Petitioner's theory fails, however, because the line of testimony was not admitted under the authority of or for the purposes described in Rule 5–404(b), but rather was admitted under Rule 5–616(c), which states, in relevant part, that a "witness whose credibility has been attacked may be rehabilitated by . . . [p]ermitting the witness to deny or explain impeaching facts . . . [or by] evidence that the court finds relevant for the purpose of rehabilitation." The testimony at issue here was admitted properly to rehabilitate the witness, not to show other crimes, wrongs or acts of the petitioner, and for this reason, neither Rule 5–404(b) nor *Faulkner's* clear and convincing evidence requirement apply. "[E]vidence of the defendant's other

---

4. Maryland Rule 5–404(b) states as follows:
   Evidence of other crimes, wrongs, or acts . . . is not admissible to prove the character of a person in order to show action in conformity therewith. Such evidence may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

crimes is admissible in a criminal case to rehabilitate a State's witness once the witness has been impeached in a substantial respect." *State v. Werner*, 302 Md. 550, 560–61, 489 A.2d 1119, 1124 (1985). Petitioner's argument against admission of this testimony would have had merit if the State had elicited such statements from the witness during direct examination to try to show that petitioner was a violent and dangerous person. The record demonstrates that this was not the case.

Petitioner impeached Nick Dieter's testimony in a substantial respect during cross-examination by pointing out that his earlier statements had omitted a significant component of his testimony. The credibility of Dieter's testimony was of obvious importance to the State's case, and petitioner's questioning of this omission implied that Dieter had fabricated the component of the testimony that he omitted in the earlier statements. This line of questioning opened the door to an explanation on redirect as to why the witness omitted the statement previously, and for this limited purpose of rehabilitation, admitting evidence of prior assaults was appropriate. The trial court was within its discretion to find that this testimony was not unduly prejudicial, especially since it did not expand upon the assaults but rather gave a narrow and concise explanation for why the witness made the omission in the earlier statements.

## B. Evidence of Assaults Upon Cheryl DiRubbo Was Admissible

As discussed above, on direct examination, Cheryl DiRubbo recanted in its entirety her earlier statement to police that implicated petitioner. The State asked if she recanted because she was afraid of petitioner, and she denied any fear of petitioner, asserting instead that her earlier statement was fabrication motivated by fear of losing custody of her son. Over petitioner's objections, the State played a portion of the recording of her earlier statement in which she indicated that she was afraid of petitioner. The State then asked if she was afraid because petitioner had told her that he would hurt anyone who testified against him. She denied this,

and the State, over defense objections, was allowed to play part of the statement in which she said that petitioner had threatened to "completely turn their lives upside down" if anyone testified against him, and went on to explain to her that this meant "that he would find them, hurt them, hurt their family, . . . hurt somebody important to them, . . . he would try and hurt them." When asked, Cheryl DiRubbo denied that petitioner had hurt her when she did not do what he wanted, and once again, over objections, the State was allowed to play a part of her earlier statement where she said petitioner had hit her "about three or four times," had punched her in the chest with a closed fist, causing her to lose her breath, and choked her with his hands.

As with the testimony regarding the assaults on Nick Dieter, petitioner argues that his objections to the admission of Cheryl DiRubbo's statements should have been sustained because these statements constituted inadmissible "other crimes" evidence under Maryland Rule 5–404(b). And as with that testimony, petitioner's theory fails because this evidence was not admitted pursuant to Rule 5–404(b). Rather, this evidence was admitted properly as extrinsic impeaching evidence under Rule 5–616(b). In relevant part, Rule 5–616(b) provides that "[e]xtrinsic evidence of bias, prejudice, interest, or other motives to testify falsely may be admitted whether or not the witness has been examined about the impeaching fact and has failed to admit it." The recorded evidence of her earlier statements regarding petitioner's threats and acts of violence against her were admissible for the purpose of impeaching her recantation on the stand by showing that she had a motive to testify falsely, namely, fear of petitioner. Rule 5–616 allows this type of evidence to be admitted for this specific purpose, and the trial court did not err in overruling petitioner's objections to it.

### C. Question Regarding Cheryl DiRubbo's Son Was Not Improper

During the process of impeaching Cheryl DiRubbo's testimony that recanted her prior statements, the State played

the portion of the statements where she explained her belief that, if someone testified against petitioner, "he would find them, hurt them, hurt their family, ... hurt somebody important to them, ... he would try and hurt them." As mentioned above, the purpose of admitting this evidence was to impeach the witness's recantation of her earlier statement by showing that the witness that had a motive to testify falsely. Shortly thereafter, the State asked Cheryl DiRubbo how old her son was, and after being told, the State asked "[a]nd you sure wouldn't want anything to happen to [your son], would you?"

Petitioner objected to this question, and argues that this objection should have been sustained, because he believes that it improperly conveyed the idea that petitioner would pose a danger to Cheryl DiRubbo's son if allowed to go free. Petitioner compares this comment to the State's closing argument in *Lawson v. State*, 389 Md. 570, 599, 886 A.2d 876, 893 (2005), that strongly inferred that the defendant charged with child rape was planning to molest his cousin's eleven-year-old child. This comparison, however, is inapt.

In *Lawson*, the State discussed how sexual molesters look like everyone else and ingratiate themselves into people's lives and noted that Lawson was letting a cousin live in an apartment for which he was paying and that the cousin "just happen[ed] to have a little 11–year–old child." *Id.* at 580, 886 A.2d at 882 (emphasis omitted). The Court held that such a clear insinuation that Lawson was planning to molest another child was speculation as to future criminality and, as such, improper argument based on facts not in evidence; we also held the error to be highly prejudicial given the facts of the case. *See id.* at 599, 886 A.2d at 893. The question posed to Cheryl DiRubbo in petitioner's trial, however, made no such inappropriate suggestion.

Taken out of context, the State's question to Cheryl DiRubbo regarding the safety of her son could, arguably, be interpreted to suggest that petitioner was a danger to her son, but a review of the direct examination dispels any such notion. Rather, the State's question is an extension of the State's

proper impeachment of the witness's recantation of her statement. In the same way that the State was pointing out her motive to testify falsely because she had stated that she believed petitioner would harm the loved ones of anybody who testified against him, the State also sought, through the question at issue, to demonstrate that this motive could be very strong and this fear very real for the witness because of her concern for her son. Thus, this question was not improper, and the trial court did not err in allowing it.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Judge HARRELL and Judge BATTAGLIA join in the judgement only.

Chief Judge BELL and Judge ELDRIDGE concur in Parts I, II, and III, and dissent from Part IV, the harmless error holding.